IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CARL HENRY BLUE, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CASE NO. 4:05-cv-02726 |
| | § | **CAPITAL LITIGANT** |
| NATHANIEL QUARTERMAN, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT'S ANSWER & MOTION FOR SUMMARY JUDGMENT WITH BRIEF IN SUPPORT

Petitioner Carl Henry Blue was properly convicted and sentenced to die for the horrific murder of Carmen Richards-Sanders while committing or attempting to commit burglary of habitation. He now challenges his presumptively valid conviction and sentence in this Court pursuant to 28 U.S.C. §§ 2241 & 2254. For the reasons discussed below, Blue fails to demonstrate that he is entitled to federal habeas relief; therefore, summary judgment should be granted in favor of Respondent, Nathaniel Quarterman ("the Director").

## BLUE'S ALLEGATIONS

The Director understands Blue to allege the following grounds for federal habeas relief:

1.     He is mentally retarded; therefore, the Eighth Amendment absolutely bars his execution. (Claim 1.)

2.      The mitigation special issue is unconstitutional because (1) it defines mitigating evidence in terms of "moral blameworthiness" (Claim 2); (2) it is not assigned a burden of proof (Claims 10,13); and (3) a jury's negative answer is not reviewable on appeal (Claim 17).

3.      He is actually innocent of capital murder.  (Claim 3).

4.      The jury was precluded from considering "residual doubt" evidence in contravention of the Eighth Amendment.  (Claims 4, 9, 19).

5.      The State violated his right to a fair trial and due process when it suborned perjury and withheld evidence.  (Claim 5).

6.      He was denied constitutionally effective assistance of counsel during the 1995 trial.  (Claims 6, 15).

7.      The evidence is insufficient to support the jury's affirmative answer to the future dangerousness special issue.  (Claim 7).

8.      The 2001 prediction of future dangerousness has been undermined by a complete lack of disciplinary action since his arrival on death row. (Claim 8).

9.      The future dangerousness special issue is unconstitutional because (1) the State's evidence was not alleged in the indictment (Claim 14); (2) the jury's affirmative answer is not given meaningful review (Claim 17); and (3) the terms "probability" and "criminal acts of violence" are not defined (Claims 7, 19).

10.     His rights under the Eighth and Fourteenth Amendments were violated when the trial court refused to instruct the jurors as to the effect of a single holdout.  (Claims 11, 20, 21).

11.     He was denied his right to have the jury selected from a venire made up of a fair cross-section of the community in violation of the Sixth and Fourteenth Amendments.  (Claim 12).

12.     He was denied his right to an impartial tribunal in violation of the Sixth and Fourteenth Amendments.  (Claim 16).

13. He was denied his right to an impartial jury when the trial court granted the State's challenge for cause as to venireperson Rosa Mata. (Claim 18).

As demonstrated below, Blue has not established the state courts were objectively unreasonable in their rejection of these claims. Moreover, seven of the claims outlined above are procedurally barred from federal habeas review. In any event, each of the claims is without merit. The Director denies all allegations of fact made by Blue, except those supported by the record and those specifically admitted herein.[1]

## STATEMENT OF THE CASE

Having been indicted on charges of capital murder, Blue was convicted and sentenced to death for the 1994 murder of Carmen Richards. I CR 1; II CR 268-72.[2] The Court of Criminal Appeals upheld Blue's conviction and death sentence. *Blue v. State*, No. 72,106 (Tex. Crim. App. Dec. 4, 1996) ("*Blue I*") (unpublished opinion). Blue did not seek certiorari review in the Supreme Court. The Court of Criminal Appeals denied Blue's state habeas application based on the trial court's findings of fact and conclusions of law. *Ex parte Blue*, No. 39,705-01 (Tex. Crim. App. Jan. 13, 1999) (unpublished order). Blue then

---

[1] Copies of Blue's state court records have been previously filed with the Court. Copies of Blue's third state habeas records are being forwarded to the Court simultaneously with this answer, but under separate cover.

[2] "CR" refers to the clerk's record of pleadings and documents filed with the trial court during the 2001 trial, preceded by the volume number and followed by the internal page number(s).

sought and was granted federal habeas relief on the basis of *Saldano* error.[3]  *See Blue v. Johnson*, Civil Action No. H-99-350 (S.D. Tex. Dec. 4, 2000); *see also* III CR 423.

A second punishment trial resulted in another death sentence, V CR 813-18, 821-28, which was again affirmed on direct appeal. *Blue v. State*, 125 S.W.3d 491 (Tex. Crim. App. 2004) ("*Blue II*"). The Supreme Court denied certiorari review. *Blue v. Texas*, 543 U.S. 853 (2004).   The Court of Criminal Appeals also denied his application for state writ of habeas corpus. *Ex parte Blue*, No. 39,705-02 (Tex. Crim. App. Nov. 10, 2004) (unpublished order).

Blue then returned to federal court. Docket Entry ("DE") 1.  But before he filed a petition, Blue sought a stay to raise an *Atkins*[4] claim in state court. DE 4.  That motion was granted, DE 5, and Blue filed a third state habeas application. *Ex parte Blue*, No. 39,705-03. After briefing and oral argument, the Court of Criminal Appeals dismissed the application as an abuse of the writ.  *See Ex parte Blue*, 230 S.W.3d 151 (Tex. Crim. App. 2007). Thereafter, Blue returned to this Court and filed his federal habeas petition.  DE 12.

---

[3]      *Saldano v. Texas*, 530 U.S. 1212 (2000).

[4]      *Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that the Eighth Amendment prohibits the execution of the mentally retarded).

## STATEMENT OF FACTS

### I.     The Facts of the Crime

The Texas Court of Criminal Appeals originally summarized the facts of the crime as follows:

> [Blue] and the deceased victim, Carmen Richard-Sanders . . ., lived together for four or five months during the early part of 1994.  However, their relationship was apparently fraught with arguments.  [Blue] even broke Richards' nose once at a family reunion after which he threatened her, "If you ever mess off on me, I'll kill you."  [Blue] also threatened to beat Richards' sister.  Richards broke off her relationship with [Blue] sometime around early summer 1994 and moved into her own apartment in College Station.  Soon after her move, Richards met and began dating the surviving victim, Larence Williams . . ..

> Approximately one week before the murder, [Blue] went to Richards' apartment uninvited and told her visiting brother, "I love her but I'll kill her."  On the evening of August 18, 1994, [Blue] again went to Richards' apartment.  While [Blue] was there Williams arrived because he and Richards had dinner plans.  However, instead of going out to dinner, Richards asked Williams to take [Blue] back to Bryan where he lived.  Williams testified that [Blue] seemed angry on the ride back to Bryan and asked if he and Richards were just "messing around."  Williams said they were just friends.  When they arrived at their destination, [Blue] stated, "Well, man, I'll go and buy me some gas and burn down that apartment and whoever's in there."

> The next morning, [Blue] left his home in Bryan around 5:30 a.m., apparently heading to the area of Richards' apartment in College Station.  Around 7:15 a.m., he went to the convenience store next to Richards' apartment and bought a 40-ounce can of malt liquor.  Seventeen to twenty minutes later he returned and bought fifty cents worth of gasoline and said something about his car.  Finally, twenty to twenty-five minutes after that, he came back a third time asking for a cup which he was then given.  [Blue] was calm and polite on each trip to the store and the clerk noticed nothing out of the ordinary about his demeanor.

> During this same time frame, Richards was getting ready to go to work where she had to be by eight o'clock.  Williams had just stopped by her apartment at

about 6:45 a.m. to pick up some papers he was going to deliver for her.  At a little before 8:00 a.m., Richards proceeded to unlock the several locks on her door while Williams waited for Richards' niece to arrive.  As Richards turned the door knob, Williams saw the door fly open as if someone had pushed it or been leaning on it.   Williams then saw Richards back up saying, "Oh my God!" until she was backed into a corner.  Williams saw arm movements and a light, heard [Blue] say, "I told you I'm going to get you," and then Richards was set on fire.  As Williams came into range, [Blue] threw the remainder of the gasoline on him and lit him on fire also.  [Blue] then threw down the cup and left.

Williams rolled on the floor to put out most of the flames and was able to get to the shower to douse any remaining sparks.  He then helped Richards do the same.  Williams called "911" and tried to put out the fire in the apartment, but decided it was too hot and that they should leave the burning building.  Volunteers who saw the smoke began to get people out of the apartment building.   One gentlemen went to help Williams and Richards, who was having difficulty breathing by this time.  Williams and Richards were taken to Brazos Valley Medical Center.  However, not being a burn center, the hospital was not equipped to give Richards definitive care for the extensive second and third degree burns on 40% of her total body surface (occurring primarily from the waist up).  Hence, she was quickly life-flighted to Hermann Hospital in Houston.  Richards died nineteen days later from multi-system organ failure caused by the extensive burns that she received on August 19, 1994.

Williams was life-flighted to Hermann Hospital at serious risk of death.  However, he survived.  Williams suffered burns from the front of his thighs up and received three skin graft surgeries.  He remained in the hospital from August 19th to November 12th.

*Blue I*, slip op. at 1-3.  *See also* 5 RR 79-102, 109-31, 140-63, 194-218, 227-36, 241, 247-75;

6 RR 6-62, 106-25, 140-53; 7 RR 5-61, 161-64, 176-78.[5]

---

[5]     "RR" refers to the reporter's record of transcribed trial and punishment proceedings from the 2001 trial, preceded by the volume number and followed by internal page number(s).

II.     **Facts Relating to Punishment**

The Court of Criminal Appeals summarized the facts adduced during Blue's second

punishment trial as follows:

> The evidence from the new punishment hearing showed that, pursuant to a pre-meditated plan, [Blue] burst into his former girlfriend's apartment, threw gasoline on her and set her on fire.  She died nineteen days later from the extensive burns that she suffered.  The evidence also showed that [Blue] has a history of violence, especially toward current and former girlfriends.[6]
>
> [Blue] presented some good character evidence and evidence that he had a drug and alcohol problem at the time of the offense. [Blue] also presented evidence from various prison employees that he had no record of violence during the seven years he was incarcerated on death row after his first trial. The prosecution responded to this through cross-examination with, among other things, evidence that [Blue's] non-violent behavior on death row could have been due to the fact that death row inmates are limited in their movements and spend most of the time locked in their cells.
>
> The prosecution presented evidence that [Blue] was a disciplinary problem while he was incarcerated in county jail for the new punishment hearing.  This evidence showed that [Blue] was "pounding and screaming" at county jail personnel after he refused their instructions to come out of his cell to get ready for court. . . .

---

6        As set out in *Blue I*, more specifically,

[o]ne woman testified [Blue] would hit her with his fists and kick her.  She further described different instances when [Blue] sexually assaulted her, threatened to kill her, and broke into her house.  A second woman also told the jury about occurrences in which [Blue] would beat her.  During one of the incidences, [Blue] beat her while she was eight months pregnant and cocked a gun and put it to her head threatening to kill her.  The woman further related times when [Blue] kicked her in the ribs and times he hit her in the face and jaw until she was unable to eat.

Slip op. at 6.  *See also* 7 RR 191-95; 8 RR 10-16, 94-111.

[Blue's] psychiatric expert expressed an opinion that there was no more than a 48 percent statistical probability that [Blue] would commit future acts of violence. This expert also testified that [Blue's] violence is "relationship driven" with "most of his major stuff" due to "some problem with women." . . .

On cross-examination, [Blue's] psychiatric expert testified that a free [Blue] would be "at an increased position for something bad." This expert also recognized that the "future dangerousness" special issue makes no distinction between "prison and real life." . . .

During closing jury arguments, [Blue] claimed that he would not be dangerous in prison if he received a life sentence which meant that he would not be eligible for parole until he had served 40 years. The prosecution responded that [Blue] is dangerous and that a life-sentenced [Blue] would be dangerous in prison.

*Blue II*, 125 S.W.3d at 493-96.

## STANDARD OF REVIEW

### I.     The AEDPA Standard

Blue filed his federal writ petition on August 16, 2007;  consequently, review is governed by the federal habeas statutes as amended by the AEDPA.  *See Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997).  Confined pursuant to a state court judgment, Blue is entitled to relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Thus, any claims Blue raises which are based solely on alleged violations of state law should be denied as a matter of law.

Habeas relief is also inappropriate for claims which are either unexhausted and procedurally defaulted, or claims which were exhausted yet were dismissed in a successive state habeas application and, thus, are also procedurally defaulted.  Indeed, under the

AEDPA, a federal habeas application shall not be granted unless:

> (A)   the applicant has exhausted the remedies available in the courts of the
>        State; or
>
> (B)   (i)    there is an absence of available State corrective process; or
>       (ii)   circumstances exist that render such process ineffective
>              to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).  Moreover, a writ may be denied on the merits, notwithstanding any

failure to exhaust available state court remedies.  28 U.S.C. § 2254(b)(2).

Regarding exhausted claims, under the AEDPA, federal habeas relief based upon

claims that were adjudicated on the merits by the state courts cannot be granted unless that

adjudication:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable
>        application of, clearly established Federal law, as determined by the
>        Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination
>        of the facts in light of the evidence presented in the state court
>        proceeding.

28 U.S.C. § 2254(d).

As to questions of law, a decision is contrary to clearly established Federal law[7] if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result. (*Terry*) *Williams v. Taylor*, 529 U.S. at 405-06; *Penry v. Johnson*, 532 U.S. 782, 792 (2001) ("*Penry II*"). Alternatively, when confronting a mixed question of law and fact, a state court "unreasonably" applies clearly established Federal law "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Penry II*, 532 U.S. at 792; *see* (*Terry*) *Williams*, 529 U.S. at 407-09.

A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. (*Terry*) *Williams*, 529 U.S. at 409-11; *Tucker v. Johnson*, 242 F.3d 617, 620 (5th Cir. 2001). Rather, federal habeas relief is merited only where the state court decision is both incorrect *and* objectively unreasonable, "[w]hether or not [this Court] would reach the same conclusion." *Woodford v. Visciotti*, 537 U.S. 19, 27 (2002). *See*

---

[7] "Clearly established Federal law" refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citing (*Terry*) *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). "In other words, 'clearly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id.* at 71-72 (citing (*Terry*) *Williams*, 529 U.S. at 405, 413, and *Bell v. Cone*, 535 U.S. 685, 698 (2002)).

*also Martin v. Cain*, 246 F.3d 471, 476 (5th Cir. 2001) (reiterating that relief is appropriate only where state court decision is both incorrect *and* objectively unreasonable).  In other words, relief is *inappropriate* when a state court, at a minimum, reaches a "satisfactory conclusion." (*Terry*) *Williams*, 529 U.S. at 411 (citing *Wright v. West*, 505 U.S. 277, 287 (1992)).

Further, it is the state court's "ultimate decision" that is to be tested for reasonableness, "not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001);  *see also Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*) (holding that a federal court's "focus on the 'unreasonable application' test under [§] 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence").  And a state court's decision need not expressly cite any federal law or even be aware of applicable Supreme Court precedent in order to be entitled to deference. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003);  *Early v. Packer*, 537 U.S. 3, 8 (2002) (state court decision must be upheld so long as the state result does not contradict Supreme Court precedent).

Regarding questions of fact, federal courts must presume correct the factual findings of the state courts unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "This presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274

-11-

F.3d 941, 948 n. 11 (5th Cir. 2001).

Additionally, except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which an applicant would challenge a state court fact finding must have been presented to the state court.  Because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence *presented in the state court proceeding*," it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner.  28 U.S.C. § 2254(d)(2) (emphasis added).

Finally, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise due diligence; *and* (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty.  28 U.S.C. § 2254(e)(2).  A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence.  (*Michael*) *Williams v. Taylor*, 529 U.S. 420, 436 (2000); *Beazley v. Johnson*, 242 F.3d 248, 272-73 (5th Cir. 2001).  For example, a petitioner's failure to present controverted, previously unresolved factual issues to the state court is sufficient to constitute "failure" under the plain meaning of § 2254(e)(2).  (*Michael*) *Williams*, 529 U.S. at 433;  *Beazley*, 242 F.3d at 273.  Yet even if a petitioner can

meet the foregoing standard, it is within this Court's discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits. *Clark v. Johnson*, 227 F.3d 273, 284-85 (5th Cir. 2000).

## II.     Summary Judgment Standard

Summary judgment is proper if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Martinez v. Johnson*, 255 F.3d 229, 237 (5th Cir. 2001) (citing *Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478, 482 (5th Cir. 2000)); Fed. R. Civ. P. 56 (c).  Rule 56 of the Federal Rules of Civil Procedure applies "with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000) (citing Rule 11, Rules Governing § 2254 Cases; Fed. R. Civ. P. 81(a)(2)).  In ruling on a motion for summary judgment, a court views the evidence through "the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby*, 477 U.S. 242, 254 (1986).  Thus, the application of the summary judgment standard to a habeas corpus case differs from its application in other civil cases to the extent that habeas' substantive evidentiary rules or burdens differ.

## ARGUMENT

## I.     Blue's Claim of Mental Retardation is Procedurally Barred from Review by this Court.  Regardless, Blue Cannot Establish that He is Mentally Retarded.  (Claim 1).

Blue first argues that he cannot be executed because he is mentally retarded.  Petition at 3-15.  While Blue acknowledges that "[n]o records of prior intellectual testing exist," he

argues that "enough evidence of adaptive deficits is available to demonstrate [] retardation." *Id*. at 6-7.  What Blue wholesale fails to address, though, is the Court of Criminal Appeals' dismissal of this claim as an abuse of the writ.  *See Ex parte Blue*, 230 S.W.3d 151.

> **A.**     **Because this claim was dismissed as an abuse of the writ by the state court, it is procedurally barred from review by this Court.**

*Atkins* was decided during the pendency of Blue's second state habeas application, but he made no attempt to amend it to include a claim of mental retardation.  *Ex parte Blue*, 230 S.W.3d at 153.  Instead, he waited until well after that application was denied and, moving under Texas Code of Criminal Procedure Article 11.071, Section 5(a)(3), Blue argued that the state court could reach the merits of his claim "if he [could] show by clear and convincing evidence that but for a violation of the United States Constitution, 'no rational juror would have answered in the [S]tate's favor one or more of the special issues that were submitted to the jury in [his] trial under Article 37.071." *Id*.  Blue also argued that "because the Eighth Amendment prohibition against executing the mentally retarded is absolute, [the court] should suspend all notions of waiver, forfeiture, procedural default, and abuse of the writ, and abandon any otherwise-valid interest the State may have in the finality of the judgment[.]" *Id*.

The court turned first to Blue's alternative argument and considered whether an *Atkins* claim could be subject to the abuse-of-the-writ doctrine.  *Id*. at 154.  In answering this question in the affirmative, the court wrote, "The existence of an absolute prohibition, even one that derives from the federal constitution, does not mandate that states create a right to

an appellate forum in which to vindicate it." *Id*. at 155.  *See also id*. at 156 ("[A]pplication of Section 5 does not violate the federal constitution just because it might deny a particular applicant review of an allegation of fact that, if true, might impose a fundamental bar to execution.").

As support for its holding, the court looked to the AEDPA's prohibition against second or successive petitions.  *Id*. at 156 & n.23 (citing 28 U.S.C. § 2254(b)(2)).  Of that, the court explained that "the Supreme Court has never identified a constitutional prohibition it regarded as *so* absolute that it would *wholly* nullify the State's otherwise legitimate interest in finality of its judgments upon the mere *allegation* that the prohibition applies." *Id*. at 157. (Emphasis in original).  *See also id*. at 158 (noting that the Court "has never definitively acknowledged that a subsequent federal habeas petitioner would be allowed to proceed on a *bare* claim of actual innocence, unaccompanied by some federal constitutional defect in his trial proceedings[]") (emphasis in original) (citing *Herrera v. Collins*, 506 U.S. 390 (1993); *Schlup v. Delo*, 513 U.S. 298 (1995); *House v. Bell*, 126 S. Ct. 2064 (2006)).[8]

Having determined that a claim of mental retardation could be dismissed as an abuse of the writ, the court went on to find that Blue had failed to make the threshold showing of evidence "that would be at least *sufficient* to support an ultimate conclusion, by clear and convincing evidence, that no rational factfinder would fail to find mental retardation." *Id*.

_____

[8]       *But see Panetti v. Quarterman*, 127 S. Ct. 2842, 2852-855 (2007) (holding that unique nature of competency-to-be-executed claims precludes them from being subject to successive petition bar if brought when first ripe).

at 163-66.  Thus, the writ was dismissed as an abuse.  *Id*. at 168 (citing Tex. Code Crim. Proc. art. 11.071, § 5(c)).

Where the last state court judgment relies upon a state procedural bar, that judgment rests on a state law ground that is independent of the federal question and adequate to support the judgment, and thus precludes federal habeas relief.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  Federal courts must honor the application of an adequate and independent state procedural bar even if the state court reaches the merits of the claim as an alternative ground for resolution. *Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989). To apply this rule of procedural default to a federal habeas petitioner, the state court's invocation of the state procedural bar must be clear and express, while the bar itself must be followed regularly by the state courts and applied to a majority of identical or similar claims.  *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001).  Once the clarity and regularity of the state procedural bar are established, a petitioner can overcome the bar to federal relief only by showing cause and prejudice for the default, or that failure to consider the claims on federal habeas will result in a "fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750.

It is well-established in this federal circuit that Texas' abuse-of-the-writ doctrine constitutes an adequate and independent state ground.  *Emery v. Johnson*, 139 F.3d 191, 195-96 (5th Cir. 1997);  *Fearance v. Scott*, 53 F.3d 633, 642 (5th Cir. 1995).[9]  Accordingly,

---

[9]     *Fearance* held that the pre-11.071 (common law) abuse-of-the-writ doctrine was strictly and regularly applied and thus was an independent and adequate state procedural bar.  56 F.3d at 642.  *Emery* extended *Fearance* to the Article 11.071 statutory abuse-of-the-

the state court's clear and express application of that law in this case bars review of this allegation in this Court.

**B.     In any event, Blue cannot establish that he is mentally retarded.**

In *Atkins*, the Supreme Court concluded that the execution of a mentally retarded individual is unconstitutionally excessive under the Eighth Amendment.  536 U.S. at 321. Recognizing that "not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus," the Court left to the states "the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." *Id*. at 317.  The Court cited with approval the American Association on Mental Retardation ("AAMR") and American Psychological Association ("APA") definitions of mental retardation, which require (1) significantly subaverage general intellectual functioning; (2) concurrent significant limitations in adaptive functioning; and (3) onset before age eighteen.  *Atkins*, 536 U. S. at 309 n. 3 (internal citations omitted);  *id*. at 317 n. 22.  As stated in *Atkins*:

> The [AAMR] defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.  Mental retardation manifests

---

writ provision.  139 F.3d at 195-96.

before age 18."[10]

> The [APA] definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C).[11]

536 U.S. at 309 n.3 (internal citations omitted).

Although Texas does not yet have statutory provisions to implement the *Atkins* decision, in the interim, the Court of Criminal Appeals has held that it will follow the AAMR or Texas Health and Safety Code criteria for addressing *Atkins* mental retardation claims. *Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004). State law defines "mental retardation" as "[1] significantly subaverage general intellectual functioning that is [2] concurrent with deficits in adaptive behavior and [3] originates during the developmental period." Tex. Health & Safety Code § 591.003(13); *Howard v. State*, 153 S.W.3d 382, 386 & n.5 (Tex. Crim. App. 2005) (citing *Briseno*, 135 S.W.3d at 7)), *cert. denied*, 126 S. Ct.

---

[10]     AAMR, Mental Retardation:  Definition, Classification, and Systems of Supports 5 (9th ed. 1992). Although the *Atkins* Court used the AAMR's ninth edition definition, in May 2002 the AAMR released its tenth edition which contained a somewhat different definition: "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.  This disability originates before age 18."  AAMR, Mental Retardation:  Definition, Classification, and Systems of Supports 1 (10th ed. 2002).

[11]     APA, Diagnostic and Statistical Manual of Mental Disorders IV-Text Revision 49 (4th ed. 2000) ("DSM-IV-TR").

1429 (2006).  This definition is "essentially the same" as the one utilized by the AAMR.

*Howard*, 153 S.W.3d at 386 (citing *Briseno*, 135 S.W.3d at 7);  *see Ex parte Modden*, 147

S.W.3d 293, 296 (Tex. Crim. App. 2004) (AAMR criteria "adopted" because consistent with

definition set out by legislature in Texas Health & Safety Code Section 591.003(13)).

> ### 1.    Blue has not established he suffers from "significantly subaverage intellectual functioning."

"[S]ignificantly subaverage intellectual functioning," is defined under Texas law as

"an IQ of about 70 or below (approximately 2 standard deviations below the mean)."  *Ex*

*parte Briseno*, 135 S.W.3d at 7 n. 24 (citing DSM-IV-TR at 39; American Association on

Mental Deficiency ("AAMD"), Classification in Mental Retardation N1 (Grossman ed.

1983)).   An individual must have an IQ score of 70 or less to meet this element of the

definition under Texas law.  *Howard*, 153 S.W.3d at 386 (citing *Ex parte Briseno*, 135

S.W.3d at 7 n.24); *Ex parte Tennard*, 960 S.W.2d 57, 61 (Tex. Crim. App. 1997); *see also*

*Penry v. Lynaugh*, 492 U.S. 302, 308 n.1 (1989) ("*Penry I*") ("To be classified as mentally

retarded, a person generally must have an IQ of 70 or below.") (citation omitted); DSM-IV-

TR at 41 ("Significantly subaverage intellectual functioning is defined as an IQ of about 70

or below (approximately 2 standard deviations below the mean)").  Blue fails to make even

this threshold showing.

The only record evidence of any IQ score comes from Dr. Windell Dickerson who

testified during trial that Blue "has an actual IQ in the range of 75-80." 10 RR 47.   Blue

acknowledges this but goes to great lengths to discredit it.  *See* Petition at 12-15 ("[N]o

responsible professional uses anything less than a full[-]scale test to determine IQ in any significant context," and discussing Flynn Effect).[12]   Regardless, this score of 75-80 is inconsistent with a finding of mental retardation and instead suggests that Blue operates in the Low-Average range of intellectual functioning.  Most importantly, no other pre-*Atkins* test scores have surfaced to potentially challenge this finding.

In the absence of any other pre-*Atkins* scores, *Blue* relies on "sketchy" school records reflecting (1) average to failing grades, (2) placement in, versus promotion to, both the fifth and sixth grades, (3) placement in special education classes, and (4) repetition of the eighth grade.  Petition at 7-8.  *Ex parte Blue*, 230 S.W.3d at 163-64; SHTr (2007) 18-25.[13]   But a myriad plausible reasons exist for the grades, as well for placement in special education classes:

> That [Blue's] academic woes were not necessarily a product of mental retardation is underscored by Dr. Patton's closing observations with respect to the school records: Clearly, these deficits in learning ability, may well be attributable to causes other than mental retardation; for example, learning disabilities and/or an impoverished family background may well have played a role, even a determinative one.

---

[12]     Blue argued the Flynn Effect during the state habeas proceedings as well.  But the Court of Criminal Appeals declined to apply it, referring to it as "unexamined scientific concept."  *Ex parte Blue*, 230 S.W.3d at 166 ("This Court has never specifically addressed the validity of the Flynn Effect.").  Morever, "[t]he Flynn Effect ... has not been accepted in this Circuit as scientifically valid."  *In re Mathis*, 483 F.3d 395, 398 n.1 (5th Cir. 2007) (citing *In re Salazar*, 443 F.3d 430, 433 n. 1 (5th Cir.2006)).

[13]     "SHTr" refers to the state habeas transcript, the transcript of pleadings and documents filed with during the state habeas proceedings, preceded by volume number and followed by year (1999, 2004, 2007) and internal page number(s).

*Ex parte Blue*, 230 S.W.3d at 165.

Ultimately, as the state court noted, Blue has utterly failed to establish any link — no matter how tenuous — between his poor academic performance and mental retardation. *Id.* at 164. *See Ex parte Smith*, 132 S.W.3d 407, 414 (Tex. Crim. App. 2004) ("A 'slow learner' is not, *ipso facto*, mentally retarded. A person who attends special-education classes does not, by virtue of that fact alone, suffer a severe disability. A person who drops out of school in the ninth grade is not necessarily the victim of a permanent disability. Similarly, one who has a disadvantaged background or a difficult childhood is not necessarily the victim of a severe and permanent disability.").[14]

>    **2.    Blue has not established that he suffers from "significantly subaverage adaptive functioning."**

Texas law describes adaptive behavior as "the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group." Tex. Health & Safety Code § 519.003(13); *Ex parte Briseno*, 135 S.W.3d at 7 n. 25 (citing same). According to the APA:

---

[14]     *Cf. Ex parte Richard Head Williams*, 2003 WL 1787634, at *3 (Cochran, J., concurring) (though it is a learning disability, "dyslexia is not mental retardation"); *Gregory K.* v. *Longview School Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987) ("learning disabilities" such as dyslexia are distinguished from disabilities that are specifically tied to IQ -- *e.g.*, mental retardation); *Betts* v. *Rector & Visitors of University of Virginia*, 113 F.Supp.2d 970, 976 n.4 (W.D. Va. 2000) (noting that the Individuals with Disabilities Education Act, 20 U.S.C. § 1401(26) defines the term "specific learning disability" as including dyslexia but excluding mental retardation).

> *Adaptive functioning* refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.  Adaptive functioning may be influenced by various factors, including education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with Mental Retardation.

DSM-IV-TR at 42.  The AAMR and APA have described the factors in evaluating adaptive functioning.  *Atkins*, 536 U.S. at 309 n.3.  For example, the AAMR's ninth edition text refers to "limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992).  The APA guidelines require "significant limitations in adaptive functioning" in at least two of its list of similar skill areas. DSM-IV-TR at 42.  The AAMR's tenth edition refers to "significant limitations ... in adaptive behavior as expressed in conceptual, social, and practical adaptive skills."  Mental Retardation:  Definition, Classification, and Systems of Supports 1 (10th ed. 2002).  As the Court of Criminal Appeals has explained, adaptive behavior "measures a person's ability to function properly in society such as, for example, meeting the needs of day to day life." *Ex parte Tennard*, 960 S.W.2d at 61.

As in state court, Blue's evidence of subaverage adaptive functioning comes from family members, an old friend and a former employer.  Petition at 8-11; SHTr (2007) 26 (affidavit of George Blue, brother), 27-28 (affidavit of Oscar Davenport, childhood friend),

-22-

29 (Ernest Gooden, uncle), 30 (Jo Ann Blue, mother), 31 (Wayne Blandford, family friend

and former employer).    Collectively,

> [t]hey provide sketchy, anecdotal evidence and opinions to the effect that
> [Blue], even from the earliest times, was gullible and susceptible to getting
> into trouble at the instigation of others, could barely read, could not follow any
> but the simplest instructions, could not manage or even count money, could not
> fill out job applications on his own, was capable of only the most menial jobs,
> which he did not hold for long, and was generally incapable of planning ahead,
> thinking for himself, or getting by day-to-day without assistance.

*Ex parte Blue*, 230 S.W.3d at 165.  But these descriptions provide no real context, no specific

examples; they do not even really give a time frame.

Further, the recollections of Blue's family and friends are called into doubt by the

record, by Blue's own actions.  First, and most importantly, Blue planned and committed this

offense all by himself.  The night before (August 18, 1994), Blue discussed it with Williams.

7 RR 18.  At 5:30 a.m. on August 19th, Blue left the motel, where he was staying with his

new girlfriend, and walked nearly seven miles back to Carmen's apartment.  5 RR 241.  He

bought the gasoline, waited twenty to twenty-five minutes, went back to the convenience

store and asked for a cup— to hold the gas.  *Id*. at 255-57.  Blue then waited outside

Carmen's door until she left for work at about 8:00 a.m.  When she opened the door, Blue

calmly rushed into her apartment and said, "I told you I was going to get you," threw the

gasoline on her and set her on her fire. 7 RR 39.  Blue then turned to Williams, threw the rest

of the gas on him and set him on fire.    After both Carmen and Williams were engulfed in

flames, Blue calmly left the apartment.  *Id*. at 38-39.    Second, the statements Blue gave to

-23-

police as well the testimony he gave during the 1995 punishment trial demonstrate that he is fully capable of holding a conversation and that he can respond coherently, rationally and on point to oral questions. XVII SF 687-89 (Blue's decision not to testify at guilt/innocence); XX SF 437-507; XXI 510-620; Defendant's Exhibits 5,6 (Blue's statements to police).[15] Third, Blue admitted that he lied to the police "[s]o I can cover myself up."  XXI SF 518.

Ultimately, as with the school records, Blue "has produced little to indicate that his adaptive deficits, if any, are related to significantly subaverage general intellectual functioning."  *Ex parte Blue*, 230 S.W.3d at 165.

### 3.    Blue has utterly failed to prove onset of limitations prior to age 18.

Finally, Blue must establish that he exhibited "both significantly subaverage intellectual functioning and concurrent deficits in adaptive behavior" before the age of eighteen.  Tex. Health & Safety Code § 591.033(13); *Ex parte Tennard*, 960 S.W.2d at 61. As noted above, Blue provides no records to show that he was ever diagnosed as mentally retarded or ever placed in special education classes *because of* his alleged retardation.  While it might be possible that he could have slipped through the cracks for all these years, it is simply not probable.  Additionally, the fact that Blue may not have always made good grades or might have been unable to keep employment for very long does not establish that he is

---

[15]      "SF" refers to the reporter's record from the 1995 trial, preceded by volume number and followed by internal page number(s).

retarded, but is instead explained by other factors, as discussed above.[16]

For all of these reasons, Blue has not demonstrated that he is, in fact, mentally retarded. Therefore, he is not entitled to federal habeas relief.

## II. Blue's Several Challenges to the Mitigation Special Issue Must be Denied. (Claims 2, 10, 13, 17).

In Texas, the jury in a capital sentencing proceeding is charged with determining

> whether, taking into consider all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than death be imposed.

The jury is further instructed that it "need not agree on what particular evidence supports an affirmative finding on the issue," and that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." Tex. Code Crim. Proc. art. 37.071 §§ 2(e)(1), 2(f)(3)-(4). Importantly, the Supreme Court has previously approved the mitigation special issue as currently worded. *See Penry II*, 532 U.S. at 803. For the reasons discussed below, Blue's challenges to the mitigation special issue are baseless.

---

[16]     In addition to the three-prong test discussed, the *Atkins* Court was partially concerned over "'abundant evidence' that mentally retarded criminals 'often act on impulse rather than pursuant to a premeditated plan' and 'the possibility' that they make false confessions." 536 U.S. at 318, 320. The record is more than sufficient to alleviate these concerns.

-25-

A.     **The Texas sentencing scheme is not unconstitutional because it defines mitigating evidence as that which reduces the defendant's "moral blameworthiness." (Claim 2).**

Blue contends that the mitigation special issue is unconstitutional because it disregards an entire class of evidence that is not closely related to the commission of crime. Petition at 16-25. Specifically, he points to (1) seven years on death row without disciplinary action, (2) a favorable risk assessment, (3) low intelligence, (4) a good work record prior to incarceration, and (5) the testimony of correctional officers who worked death row as being outside the bounds of "moral blameworthiness." *Id*. at 18. The Court of Criminal Appeals summarily rejected this claim on direct appeal. *Blue II*, 125 S.W.3d at 504-05. As explained below, rejection was not objectively unreasonable.[17]

Citing *Lockett v. Ohio*[18] and *Eddings v. Oklahoma*,[19] Blue submits that this instruction defining mitigating evidence in terms of a defendant's "moral blameworthiness" impermissibly limits the jury's consideration of mitigating evidence generally. Petition at 16-25. He also invokes *Penry I* for the proposition that the vagueness of this term leaves

---

[17]     Blue relies in part on the Fifth Circuit's determination that a capital sentencing jury must be able to give "full consideration and full effect" to the defendant's mitigating evidence. Petition at 23 (citing *Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006) (*en banc*), *cert. denied Quarterman v. Nelson*, 127 S. Ct. 2974 (2007)). His reliance is misplaced. The jury in *Nelson* did not have the benefit of the mitigation special issue, which closes the gap in the former special issues and provides the jury with a constitutionally-mandated vehicle for giving "full consideration and full effect" to a capital defendant's mitigating evidence.

[18]     438 U.S. 586 (1978) (plurality opinion).

[19]     455 U.S. 104 (1982).

doubt as to what meaning the jury gave to it.  *Id*. at 22-23.  Because defining mitigating evidence in terms of "moral blameworthiness" does not contravene the Supreme Court's Eighth Amendment jurisprudence as Blue suggests, he is not entitled to federal habeas relief.

The Eighth Amendment demands that the jury be able to consider and give effect to all mitigating evidence the defendant may proffer.  *E.g.*, *California v. Brown*, 479 U.S. 538, 541 (1987); *Eddings*, 455 U.S. at 110; *Lockett*, 438 U.S. at 604.  The only limit the Supreme Court has placed on that demand is to say that the evidence must be merely relevant.  In *McCoy v. North Carolina*, the Court adopted the definition of relevance used in civil proceedings, that is evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without it." 494 U.S. 433, 440-41 (1990) (internal quotation marks and citation omitted)).  Relevant evidence in the context of a capital sentencing proceeding is that which goes to the defendant's character and background or the circumstances of the offense. As Justice O'Connor has explained,

> evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.

*Brown*, 479 U.S. at 545(O'Connor, J., concurring). *See also Penry II*, 532 U.S. at 797; *Penry I*, 492 U.S. at 319; *Franklin v. Lynaugh*, 487 U.S. 164, 180 (1993) (plurality opinion); *South Carolina v. Gathers*, 490 U.S. 805, 810-12 (1989); *Lockett*, 438 U.S. at 604, 606.  Thus, "the

question is simply whether the evidence is of such character that it 'might serve as a basis for a sentence less than death.'" *Tennard v. Dretke*, 524 U.S. 274, 287 (2004) (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)).

Texas' definition of mitigating evidence directly comports with the Court's long-standing requirement that a defendant's "punishment [] be tailored to his personal responsibility and moral guilt." *Enmund v. Florida*, 458 U.S. 782, 801 (1982). *See also id*. at 825 (O'Connor, J., dissenting) ("[P]roportionality requires a nexus between the punishment imposed and the defendant's blameworthiness."); *Tison v. Arizona*, 481 U.S. 137, 149 (1987) ("The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender."). As Justice O'Connor has opined, "[T]he individualized assessment of the appropriateness of the death penalty is a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence." *Brown*, 479 U.S. at 545 (O'Connor, J., concurring). Finally, the Court has previously recognized that "virtually any mitigating evidence is capable of being viewed as having some bearing on the defendant's 'moral culpability' apart from its relevance to the particular concerns embodied in the Texas special issues." *Graham v. Collins*, 506 U.S. 461, 476 (1993). Thus, Blue's claim that Texas' use of the term "moral blameworthiness" impermissibly narrows the scope of the jury's consideration of mitigating evidence must fail.

Nevertheless, Blue argues that Texas should be required to define "moral blameworthiness." He suggests not only that his evidence is beyond the scope of the future

-28-

dangerousness special issue, but also that by instructing the jury as it did, the trial court put his mitigating evidence beyond the jury's effective reach, in spite of a the statutory instruction to consider it.   Petition at 18 (suggesting that "the trial judge [was] giving the jury permission, perhaps even encouragement, to disregard some of [Blue's] mitigating evidence").  The fallacy of this should be obvious.  Moreover, the Supreme Court has never "held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence."  *Buchanan v. Angelone*, 522 U.S. 269, 277 (1998).  Rather, the core concern has always been that the jury be able to consider and give effect to any mitigating evidence the defendant presents.  *See Abdul-Kabir v. Quarterman*, 127 S. Ct. 1654, 1664 (2007) ("A careful review of our jurisprudence in this area makes clear that well before our decision in *Penry I*, our cases had firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future."); *see also Brewer v. Quarterman*, 127 S. Ct. 1706, 1709 (2007) ("As an overview of the cases both preceding and following *Penry I* demonstrates, we have long recognized that a sentencing jury must be able to give a 'reasoned moral response ' to a defendant's mitigating evidence-particularly that evidence which tends to diminish his culpability-when deciding whether to sentence him to death."). Nothing Blue argues calls into question the propriety of *Penry II*'s approval of the mitigation special issue.  The mitigation special issue,

contrary to Blue's assertion, specifically allows the jury to make the individualized determination the Court has at all times required for the valid imposition of the death penalty. *Penry II*, 532 U.S. at 797; *see also Woodson*, 428 U.S. at 304.

For these reasons, Blue is not entitled to federal habeas relief on this claim.  *See* 28 U.S.C. § 2254(d)(1).

> **B.   The Court of Criminal Appeals properly determined that the mitigation special issue was not impacted by the Supreme Court's decisions in *Apprendi*[20] and *Ring*.[21]  (Claims 10, 13).**

Citing to *Apprendi* and *Ring*, Blue invites this Court to find that the mitigation special issue as provided for under Texas law violates the Sixth and Eighth Amendments because it places the burden of proof on the *defendant* to establish the *existence* of mitigating circumstances rather than requiring the *State* to prove beyond a reasonable doubt the *absence* of the same.   Petition at 66-86; *see also id.* at 95-99.  No interpretation of the Eighth Amendment would support such a holding.

The *Apprendi* Court held that any facts triggering the application of an enhancement statute must be submitted to the jury and proven beyond a reasonable doubt.  530 U.S. at 490. Building on *Apprendi*, *Ring* held that a jury must determine the existence of any aggravating factors that are necessary to impose the death penalty and that those factors must be proven beyond a reasonable doubt.  536 U.S. at 609.  Neither holding is relevant to, or supports,

---

[20]     *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

[21]     *Ring v. Arizona*, 536 U.S. 584 (2002).

Blue's position.  By basing his argument on the fallacy that a negative answer to the Texas mitigation special issue actually *increases* the penalty for capital murder beyond the prescribed statutory maximum, Blue strikes out twice.

The prescribed maximum penalty for capital murder in Texas is death.  Tex. Penal Code § 12.31(a).  In rendering its verdict of "guilty" and submitting an affirmative answer to the future dangerousness special issue, Blue's jury — not the trial judge — found that the prosecution had proven each element of the offense *and* the relevant aggravating factors beyond a reasonable doubt.  Second, the absence of sufficient mitigating circumstances is neither an element of capital murder nor an *aggravating* fact that increases the penalty for capital murder.  Rather the presence of sufficient mitigating circumstances is a *mitigating* fact that allows the defendant to *escape* the maximum penalty for capital murder.  For the reasons already stated, and for those discussed more fully below, federal habeas relief should be denied.

1.    **The Sixth and Fourteenth Amendment considerations underlying *Apprendi* and *Ring* do not apply to jury determinations of *mitigating* factors that might *reduce* a defendant's sentence.**

The rationale behind the Court's rulings in *Apprendi* and *Ring* simply does not apply to jury determinations that *spare* a defendant from the harshest possible punishment.  As the Court explained in *Tuilaepa v. California*,  a criminal defendant's death eligibility requires the jury to "convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase." 512 U.S. 967, 972 (1994). "The aggravating

circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)." *Id*. A further caveat is that aggravating circumstances may not apply to every convicted murderer. *Id*. In requiring prosecutors to prove beyond a reasonable doubt any aggravating factor that increases a punishment above a statutory maximum penalty, the Court seamlessly harmonized its Sixth Amendment *Apprendi/Ring* analysis with its well-established Eighth Amendment *Tuilaepa* jurisprudence. Those principles were not breached in Blue's case, where the aggravating circumstances in question were the burglary element of the capital murder statute and the future dangerousness special issue. Neither is applicable to every murderer, and the trial court submitted both to Blue's jury, and the State proved both beyond a reasonable doubt.

The mitigation special issue, on the other hand, is neither an element of capital murder nor an aggravating circumstance under *Tuilaepa*. Rather, the question affords the jury an opportunity to make the individualized determination of the offender's moral culpability, required by the Eighth Amendment. *See Penry II*, 532 U.S. at 797 (explaining that, the only way to ensure that the jury has made an individualized determination that death is the appropriate sentence for a particular defendant is to give the jury a "vehicle" by which to fully consider any mitigating circumstances before rendering its sentencing determination) (citing *Penry I*, 492 U.S. at 319, 328); *Eddings*, 455 U.S. at 113-14; *Woodson*, 428 U.S. at 304. Such a determination need not be structured in any particular way, as long as the jury is allowed to judge for itself what is mitigating and in what way. *Franklin*, 487 U.S. at 179;

*Mills v. Maryland*, 486 U.S. 367, 373-75 (1988); *Booth v. Maryland*, 482 U.S. 496, 502 (1987), *overruled on other grounds*, *Payne v. Tennessee*, 501 U.S. 808 (1991); *Zant v. Stephens*, 462 U.S. 862, 875-76 (1983).

This constitutionally-mandated function is served by Texas' mitigation special issue question, by which the jury is required to consider all of the evidence—the circumstances of the offense, the defendant's character and background, and the defendant's general moral culpability—but is not required to agree on what specific evidence is sufficiently mitigating to justify a life sentence rather than death by lethal injection. Tex. Code Crim. Proc. art 37.071 § 2(e) & (f); *see also* IV CR 797 (instructing Blue's jurors they need not agree on what constituted "sufficient mitigating circumstances"). Texas juries therefore have ample ability to show leniency and *reduce* the defendant's ultimate sentence to life imprisonment. *See Penry II*, 532 U.S. at 803 (approving the "brevity and clarity" of the current mitigation special issue as a catchall mitigation instruction).

Particularly noteworthy here is the fact that the judge-versus-jury problem in both *Apprendi* and *Ring* is inapposite to Texas law, under which trial judges have no fact-finding role in capital murder cases. Tex. Code Crim. Proc. art. 37.071 § 2(e). Additionally, neither *Ring* nor *Apprendi* contemplate that the Sixth Amendment's "reasonable doubt" requirement is applicable to how a capital sentencing jury weighs mitigating evidence.

*Ring*, for example, specifically focused on *aggravating* findings made by a *judge alone*. 536 U.S. at 609. In addressing the matter, the Supreme Court emphasized that

"Ring's claim [was] tightly delineated" to the issue of whether the Sixth Amendment requires a jury finding on the aggravating circumstances asserted against him, and "ma[de] no Sixth Amendment claim with respect to mitigating circumstances." *Id*. at 597 n. 4. In closing, the Court again reiterated that its opinion was confined to the facts of *Ring*'s case. *See id*. at 609 (concluding that portions of its decision in *Walton v. Arizona*, 497 U.S. 639 (1990), were irreconcilable with *Apprendi*, and, therefore "overrule[d] . . . to the extent that [*Walton*] allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty"). Though the Court held that the Sixth Amendment requires aggravating factors that operate as "the functional equivalent of an element of a greater offense" to be found by a jury, it declined to comment on whether a similar requirement applies to a jury's findings on mitigating factors. *See id*. (quoting *Apprendi*, 530 U.S. at 494 n. 19).

Likewise, *Apprendi* specifically notes and reaffirms the distinction between "facts in aggravation of punishment and facts in mitigation." 530 U.S. at 490 n. 16. In that case, the Court reasoned that a judicial fact-finding that allows a defendant to "escape the statutory maximum" penalty attached to a jury verdict "neither expos[es] the defendant to a deprivation of liberty greater than that authorized by the verdict according to the statute, nor . . . impos[es] upon the defendant a greater stigma than that accompanying the jury verdict alone." *Id*. It would therefore stand to reason that the Sixth and Fourteenth Amendment concerns at issue in *Apprendi* are nonexistent in the context of mitigation. *Id*.; *see also id*.

-34-

at 501 (suggesting that "a 'crime' includes every fact that is by law a basis for imposing or increasing punishment (in contrast with a fact that mitigates punishment)") (Thomas, J., concurring).

The surviving portion of *Walton* is also consistent with this distinction.  As explained in Part III of that decision, the Eighth Amendment does not bar a state from imposing a burden of proof *on the defendant* to "establish, by a preponderance of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency." *Walton*, 497 U.S. at 649-51.  *Walton* further notes that nothing in the Supreme Court's Eighth Amendment jurisprudence precludes the states from "specifying how mitigating circumstances are to be proved." *Id*. at 649.  Indeed, in several other cases, the Court found it constitutional for a state to impose a burden of proof on the defendant to prove issues such as self-defense, insanity, and extreme emotional disturbance.  *Id*. at 650 (citing *Martin v. Ohio*, 480 U.S. 228 (1987); *Patterson v. New York*, 432 U.S. 197 (1977); *Rivera v. Delaware*, 429 U.S. 877 (1976); *Leland v. Oregon*, 343 U.S. 790 (1952)).  From those cases, the Court arrived at the following rule:

> So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.

*Walton*, 497 U.S. at 650.  Just as in *Apprendi* and *Ring*, the Court in *Walton* expressly distinguished aggravating factors from mitigating factors.

-35-

The Texas mitigation special issue question certainly does not operate as "the functional equivalent of an element of a greater offense." *Ring*, 536 U.S. at 609; *Apprendi*, 530 U.S. at 494.  Though Blue argues otherwise and asserts that the *absence* of sufficient mitigating evidence functionally *aggravates* his sentence from life to death, such an interpretation of *Apprendi* and *Ring* would pervert this Court's Eighth Amendment jurisprudence given that the mitigation special issue question inured to Blue's benefit by affording his jury a vehicle by which to give effect to his mitigating evidence.

## 2.    Blue's application of *Apprendi* and *Ring* to the mitigation special issue would lead to absurd results.

Under Texas law, capital murder defendants are under an implicit burden to produce and present mitigating evidence. *Lawton v. State*, 913 S.W.2d 542, 557 (Tex. Crim. App. 1995); *Eldridge v. State*, 940 S.W.2d 646, 652 & n. 9 (Tex. Crim. App.  1996).  But Blue would have the burden of proof placed on the State.  Petition at 95-99.  Were this Court to adopt Blue's position, mitigating evidence that is merely produced by the defendant (and is amorphously defined by necessity) would entitle him to a life sentence *as a matter of law* if not disproved by the State beyond a reasonable doubt.  Blue does not suggest how that end might be rationally accomplished.

As was reiterated in *Penry I*, "defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."  492 U.S. at 319 (quoting *California v. Brown*, 479 U.S. at 545 (O'Connor, J., concurring)).  Thus, the definition of

"mitigating" depends on what a "disadvantaged background" is, what emotional or mental problems consist of, and, most importantly, who is "less culpable." Indeed, mitigation is analogous to proximate causation[22] and, as such, cannot be proven *or* negated beyond a reasonable doubt because such value judgments inherently fall across a spectrum of plausibility more suited to the "preponderance of the evidence" standard than to the black-and-white, "definitely yes" or "definitely no" reasonable doubt standard. Accordingly, even if the Constitution required that a burden of proof be placed upon the State regarding the mitigation special issue, only a preponderance standard would be rational.

Under Blue's approach, if a defendant produced evidence of childhood abuse, for example, the State would be required to prove that such abuse either did not occur or did not cause the defendant's criminal act.[23] That such a thing could be proven is doubtful and is certainly irrelevant to the jury's ultimate decision, *i.e.*, whether circumstances demand that the defendant's life be spared. The only workable solution to such a dilemma would be to rely on sentencing guidelines that value different types of mitigating evidence, quantify the defendant's death-worthiness, and apply a balancing equation to the results.

---

[22]    In this way, the jury could have, contrary to Blue's argument, given effect to evidence that Carmen was not resuscitated and that this was the actual cause of her death. Petition at 65.

[23]    Such a scheme would lead to infinitely ludicrous results: would the State be required to prove beyond a reasonable doubt that a defendant was a "bad" son if the defendant's mother testified he was a "good" son? What amount of evidence could overcome a diagnosis of mental illness? Would the State be required to produce an expert opinion to the contrary? Two expert opinions?

Yet this type of system removes moral discretion from the jury to the legislators or judges who compiled the guidelines and who, coincidentally, have no real knowledge or appreciation for the individual circumstances of a particular capital case.  Such a system would not only defy the Sixth Amendment jury rationale of *Apprendi* and *Ring*, it would also violate the Eighth Amendment's requirement for individualized sentencing.  *See McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) ("[T]he Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence") (emphasis in original); *Lockett*, 438 U.S. at  604 (holding that the sentencer cannot "be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death") (emphasis in original).  This is precisely why the Supreme Court excepted mitigating circumstances from the ambit of *Apprendi* and *Ring*.

Indeed, the Court of Criminal Appeals court has clearly, and correctly, rejected the idea that any evidence could be per se mitigating.  *McFarland v. State*, 928 S.W.2d 482, 498 (Tex. Crim. App. 1996).  "Unlike a particular offense or defense," that court explained, "the weighing of 'mitigating evidence' is a subjective determination undertaken by each individual juror."  *Id*.  *See also Colella v. State*, 915 S.W.2d 834, 844 (Tex. Crim. App. 1995) ("The amount of weight that the factfinder might give any particular piece of mitigating evidence is left to 'the range of judgment and discretion' exercised by each juror")

(quoting *Banda v. State*, 890 S.W.2d 42, 54 (Tex. Crim. App. 1994)).   While the Constitution forbids "untrammeled discretion to *impose* the death sentence," the "untrammeled discretion to *afford life* to a death eligible defendant does not offend the United States Constitution."   *Lawton*, 913 S.W.2d at 558; *see also Gregg v. Georgia*, 428 U.S. 153, 199 (1976) ("Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution").

Accepting Blue's interpretation would punish the State of Texas for doing exactly as it was told to do in *Penry I* — allow the jury open-ended discretion to consider mitigating circumstances and impose a life sentence if appropriate to the defendant and the crime.   At the same time, the application of *Apprendi* and *Ring* to the Eighth Amendment context of mitigation would lead to impossible and absurd results by forcing the State to *objectively* refute fundamentally *subjective* moral considerations urged to a jury in defense of a man's life.   Finally, Blue's proposition is untenable because the absence of mitigating circumstances is not an element of the crime or a sentencing aggravator that must be pled and proven by the State beyond a reasonable doubt.   Thus, the core Sixth Amendment principles of due process and fair notice recognized in *Apprendi* and *Ring* are not implicated here.

C.     **That Texas declines to review the sufficiency of the evidence in mitigation is not a violation of the Eighth Amendment.   (Claim 17).**

Finally, Blue takes issue with Texas' refusal to provide for appellate review of a jury's finding on mitigating evidence. Petition at 108-09, 111.   As the mitigation special issue

-39-

comprises the selection decision,[24] no constitutional violation can arise from Texas' actions.

The *Tuilaepa* Court explained that it is only the *eligibility* decision that must be made with "maximum transparency" so that it may be rationally reviewed.  512 U.S. at 973.  In Texas, eligibility is determined at the trial on guilt/innocence, and it is, in part, determined a second time when the jury considers whether the defendant will be a future danger.[25]  *See Jurek v. Texas*, 428 U.S. 272, 268-72 (1976) (plurality opinion); *see also* Tex. Penal Code § 19.03.  As discussed more thoroughly below, the Court of Criminal Appeals does in fact review the evidence introduced to culminate in a death sentence.  In this case, the state court conducted that review twice — once after the original 1995 punishment verdict and again after the 2001 resentencing.  Each time, the court concluded that "a rational juror could have found [Blue] would probably be a continuing threat to society."  *Blue I*, slip op. at 7, cited in *Blue II*, 125 S.W.3d at 496.

On the other hand, of the selection decision, the Court recognized that the jury is free to consider "a myriad of factors to determine whether death is the appropriate punishment.  Indeed, the sentencer may be given unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty."  *Id*. at 979-80.  Such unfettered discretion assures a capital

---

[24]     At the selection decision, "the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence."  *Tuilaepa*, 512 U.S. at 972.

[25]     However, the future dangerousness special issue is also a "selection" factor, since it has been construed under most circumstances to "allow the consideration of particularized mitigating factors."  *Lowenfield v. Phelps*, 484 U.S. 231, 245 (1988).

defendant that the punishment imposed is "an individual determination on the basis of the character of the individual and circumstances of the crime." *Zant v. Stephens*, 462 U.S. at 879. That is, the jury is free to hear, consider, and give effect to all relevant evidence before assessing such a severe penalty. As such, there is no restriction on the jury's ability to extend mercy and choose *not* to sentence a defendant to death. Requiring an appellate court to second-guess a jury's subjective determination of extenuating circumstances would inevitably result in courts prioritizing certain mitigating factors over others and, therefore, restricting a sentencing jury's capacity to individually assess the circumstances and situation of each defendant in violation of the Court's directive.

Thus, although a capital defendant is entitled to "meaningful appellate review" of a death sentence under the Eighth and Fourteenth Amendments, appellate courts are not required to conduct an independent review of the jury's mitigation finding. *See McClesky v. Kemp*, 481 U.S. 279, 308 (1987); *Pulley v. Harris*, 465 U.S. 37, 45-46 (1984). Indeed, the Supreme Court has explained,

> an appellate court, unlike a capital sentencing jury, is wholly ill-suited to evaluate the appropriateness of death in the first instance. Whatever intangibles a jury might consider in its sentencing determination, few can be gleaned from an appellate record. This inability to confront and examine the individuality of the defendant would be particularly devastating to any argument for consideration of what this Court has termed "[those] compassionate or mitigating factors stemming from the diverse frailties of humankind." *When we held that a defendant has a constitutional right to the consideration of [mitigating] factors . . . we clearly envisioned that that consideration would occur among sentencers who were present to hear the evidence and arguments and see the witnesses.*

-41-

*Caldwell v. Mississippi*, 472 U.S. 320, 330-31 (1985) (internal citations omitted) (emphasis added).  It is on this basis that the Court of Criminal Appeals has repeatedly declined to review the sufficiency of the evidence to support a jury's negative answer to the mitigation special issue.

> Under Article 37.071[, Section] 2(f), the jury determines whether any evidence has mitigating effect and, if so, how much. . . . [T]hese two decisions are normative and therefore not reviewable by this Court.  So long as the jury has all the potentially relevant evidence before it, we continue to defer to the jury. . . . [T]here is simply no way for an appellate court to review the jury's normative judgment that the evidence did or did not warrant a life sentence.

*Eldridge v. State*, 940 S.W.2d at 652, 653 (citations and quotations omitted).

Nevertheless, Blue takes issue with the state court's decision not to review the sufficiency of the mitigating evidence, asserting that a reasonable juror could not have considered the mitigating evidence he presented during his second trial and sentenced him to death.  The crux of his argument seems to be that neither the jury nor the Court of Criminal Appeals considered the evidence, in direct contravention of the Constitution.  No one can say with certainty what weight, if any, the jury gave to Blue's evidence of his good character, the fact that he had a drug and alcohol problem at the time of the offense and his record of seven years of good behavior while on death row.  *See Colella*, 915 S.W.2d at 844 ("The amount of weight that the factfinder might give any particular piece of mitigating evidence is left to the 'range of judgment and discretion' exercised by each juror." (citation omitted)); *see also Eddings*, 455 U.S. at 114 ("The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence[,] [b]ut they may not give it

no weight by excluding such evidence from their consideration.") (footnote omitted).  But that is irrelevant.

As discussed throughout this answer, the Court has been unwavering in its demand that the states enable capital sentencing juries to consider and give effect to mitigating evidence.  *See Eddings*, 455 U.S. at 113-14 ("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence.")  The evidence Blue presented not only had mitigating relevance to the future dangerousness special issue, it could have also been considered as "reduc[ing] [his] moral blameworthiness."  Thus, had the jury chosen to do so, it could have given effect to this evidence by imposing a life sentence.  Simply because the sentence was death rather than life, it does not follow that the jury impermissibly refused to consider his mitigating evidence.[26]  Nor does it follow that Texas'

---

[26]      In *Johnson v. Texas*, the Court placed special emphasis on the fact that Texas juries are aware of the consequences of their actions thus are "likely to weigh mitigating evidence as it formulates these answers in a manner similar to the employed by capital juries in 'pure balancing states.'" 509 U.S. 350, 370-71 (1993) (quoting *Franklin v. Lynaugh*, 487 U.S. at 182 n.12).  *See* Tex. Code Crim. Proc. art. 37.071.   Further, outside of pure speculation based on a self-serving and myopic interpretation of the evidence, Blue has not demonstrated that this jury disregarded his evidence completely, especially in light of its instruction to consider all of the evidence. V CR 795; *see Buchanan*, 522 U.S. at 278.   The responsibility foisted upon a jury in a capital murder trial is serious.  We cannot blithely assume they do not take it seriously.  The *Lockett* Court presumed  that "'jurors . . . confronted with the awesome responsibility of decreeing death for a fellow human [would] act with due regard for the consequences of their decision.'" 438 U.S. at 598 (quoting *McGautha v. California*, 402 U.S. 183, 208 (1971)).  Nothing in the record suggests the jury in this case acted in a contrary manner.

-43-

refusal to review the jury's negative answer to the mitigation special issue somehow runs afoul of the Eighth Amendment's requirement for "meaningful appellate review" of the imposition of the death sentence.

For all of these reasons, Blue's challenges to the mitigation special issue must be rejected.

## III.   Blue's Claim of Actual Innocence Must Fail.   (Claim 3).

Pointing to the alleged incredibility of Larence Williams' testimony, together with the State's arson investigators and the photographs of the crime scene, Blue claims he has established actual innocence because this "is enough to render the evidence of unlawful entry insufficient." Petition at 25-26. As an initial matter, it is well established that free-standing claims of actual innocence cannot support federal habeas relief. *Herrera v. Collins*, 506 U.S. at 404. Left open was the question whether a "truly persuasive" actual innocence claim would state a constitutional violation sufficient for habeas relief.[27] *Id*. at 417. However, the Fifth Circuit has consistently rejected this theory. *Dowthitt*, 230 F.3d 733, 741 (5th Cir. 2000); *Graham v. Johnson*, 168 F.3d 762, 788 (5th Cir. 1999); *Lucas v. Johnson*, 132 F.3d 1069, 1075 (5th Cir. 1998).

But even if this Court could consider the "truly persuasive demonstration" language of *Herrera*, federal habeas relief under these circumstances would be available *only* "if there were no state avenue open to process such a claim." *Herrera*, 506 U.S. at 417; *see also*

---

[27]     And that question remains open. *See House v. Bell*, 126 S. Ct. at 2087.

*Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003).  First, the claim was properly raised,[28] but rejected, during the state habeas proceedings.  Second, like all death-sentenced inmates, Blue may still utilize the State's procedures for seeking executive clemency.  *See* Tex. Crim. Proc. Code art. 48.01 (West 2001); *Lucas*, 132 F.3d at 1075.  Thus, Blue's free-standing claim of actual innocence must be denied.   Regardless, as demonstrated below, Blue is far from "actually innocent."

Challenges to sufficiency of the evidence are judged under the standards of *Jackson v. Virginia*, 443 U.S. 307 (1979).  The *Jackson* standard asks "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Hughes v. Johnson*, 191 F.3d 607, 619 (5th Cir. 1999) (quoting *Jackson*, 443 U.S. at 319).  "[T]he standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law."  *Jackson*, 443 U.S. at 324 n.16; *Hughes*, 191 F.3d at 619.  If the evidence is sufficient to prove the substantive elements of the charge, then the standards of *Jackson* are met.  *Brown v. Collins*, 937 F.2d 175, 182 (5th Cir. 1991). Even if state law imposes a more demanding standard, only the *Jackson* standard of sufficiency of the evidence need be satisfied.  *Gilley v. Collins*, 968 F.2d 465, 468 (5th Cir. 1992).  Thus, regardless of whether the facts of the case could hypothetically support the defendant's claim of innocence, if a rational trier of fact could have found the essential elements of a crime,

---

[28]       *See Ex parte Elizondo*, 947 S.W.2d 202, 205 (Tex. Crim. App.  1996).

beyond a reasonable doubt, then the evidence is sufficient to support a conviction under the *Jackson* standard. *Id*.

Under Texas law, an individual commits murder if he "intentionally or knowingly causes the death of an individual." Tex. Penal Code § 19.02(b)(1). That individual commits capital murder if he commits murder as just defined and, *e.g.*, he commits that murder during the commission of another felony, as in this case, burglary of a habitation. Tex. Penal Code § 19.03(a)(2). A charge of burglary of a habitation requires the State to prove the defendant entered a habitation without consent and with the intent to commit a felony or theft. Tex. Penal Code § 30.02(a)(1). Blue's single contention is that the evidence is insufficient to establish that he entered Carmen's apartment without her consent. As an initial matter, the Court of Criminal Appeals noted that there was "overwhelming evidence" that Blue did *not* have Carmen's consent to enter her apartment that morning. *Blue II*, 125 S.W.3d at 503. This finding is clearly supported by the record, and therefore not objectively unreasonable. 28 U.S.C. § 2254(d)(2).

-46-

As to the specific challenge to Larence Williams' credibility,[29] the state habeas court conducted an exhaustive review of his testimony at both the 1995 trials on guilt/innocence and punishment and the 2001 re-trial on punishment.  *See* 5 SHTr (2004) 486-95 (Findings of Fact, ¶¶ 9-17).  Ultimately, the court found that "Williams' 2001 testimony does not recant his 1995 testimony, but continues to allege that [Blue] entered the apartment without the consent of Carmen Richards-Sanders."  *Id*. at 495 (Findings of Fact, ¶ 18).  *See also* 6 SHTr (2004) 527-28 (Conclusions of Law, ¶107) (comparison establishes that Williams' testimony at 1995 trial does not "materially differ" from his 2001 testimony).

Finally, and importantly, Blue totally discounts the jury's role as the sole arbiter of credibility:

> A fundamental premise of our criminal trial system is that "the jury is the lie detector."  *United States v. Barnard*, 490 F.2d 907, 912 [(9th Cir. 1973)].  Determining the weight and credibility of witness testimony, therefore, has long been held to be "part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men. *Aetna Life Ins. Co. v. Ward*, 140 U.S.

---

[29]     In both these proceedings and the state habeas proceedings, Blue mentioned the testimony of the State's arson investigators and the crime-scene photographs as support for his claim of actual innocence.  Although the burden of proof lies squarely with the federal habeas petitioner, nowhere does he even allude to how this evidence, when coupled with Williams' supposed lies during the first trial, creates reasonable doubt enough to support a new trial.  *See Goodwin v. Johnson*, 224 F.3d 450, 456 (5th Cir. 2000) (noting that a federal habeas court "'should not lose sight of the fact that is the habeas applicant who has the burden of proving a constitutional violation'" (quoting *Enlge v. Sims*, 450 U.S. 936, 941-42 (1981) (Rehnquist, J., dissenting from the denial of certiorari))); *see also Tyler v. Beto*, 391 F.2d 993, 995 (5th Cir. 1968) (explaining that a petitioner in a habeas corpus proceeding has the burden of proof to establish sufficient facts to warrant a finding of the denial of his constitutional rights).

76, 88 [] (1891).

*United States v. Scheffer*, 118 S. Ct. 1261, 1266 (1998).

As the state habeas court's conclusion finds ample support in the record so it cannot be objectively unreasonable.  28 U.S.C. § 2254(d)(2).  For these reasons, Blue is not entitled to federal habeas relief on this claim.

**IV.    Blue's Allegations that the Jury was Precluded from Considering "Residual Doubt" Evidence Must be Denied.  (Claims 4, 9, 19).**

Blue next argues that the trial court implicitly precluded consideration of evidence "tending to show that Blue had the effective consent of [Carmen] to enter her apartment." Petition at 27-30.  *See also id*. at 54-66, 119-22.  Specifically, he complains of the trial court's instruction explaining that Blue had been previously found guilty of capital murder, to-wit: murder in the course of committing or attempting to commit burglary of a habitation. V CR 794.[30]  He also complains about the trial court's refusal to instruct the jury that it must "consider any evidence of the circumstances of the offense that tend to show [Blue] did not kill [Carmen] in the course of burglary or attempted burglary or that tend to show some other contributing causes as to [Carmen's] death."  Petition at 119.  As support for this claim, Blue

---

[30]      This argument is internally inconsistent.   According to Blue's argument, the jruros would be in the same position —  unable to consider "residual doubt" evidence —  if they had been the ones that actually found Blue guilty of capital murder.   The facts underlying the conviction would not have changed from guilt/innocence to punishment, and at the beginning of the punishment charge, the jury would have been instructed that they had previously found Blue guilty of capital murder, to-wit: murder in the course of committing or attempting to commit burglary of a habitation.   Blue's logic would thus apply to every defendant convicted of capital murder and facing the death penalty.

offers the affidavit of juror Sandra Cooper.  *Id.* at 30.  Cooper explained:

> There is doubt in my mind as to whether or not Mr. Blue entered the victim's apartment without her consent.  On the evidence, I saw and heard, I might not have voted to convict Mr. Blue of capital murder, perhaps just murder.  I did not consider or give any effect to my doubts about Mr. Blue's guilt of a capital crime in making my decision about punishment because I understood the judge's instructions to mean that I did not have the authority to do so as a juror in the punishment phase only.

*Id*.  *See also* 1 SHTr (2004) 74.  But the state habeas court did not consider this affidavit.  *See* 6 SHTr (2004) 528-29 (Conclusions of Law, ¶¶ 109-11) (citing Tex. R. Evid. 606(b)).   As the Fifth Circuit has recognized, no "Supreme Court precedent obligate[s] a state to admit testimony from jurors concerning [deliberations]."  *Salazar v. Dretke*, 419 F.3d 384, 399-400 & n.28 (5th Cir. 2005), *cert. denied*, 547 U.S. 1006 (2006).  Thus, the state court's rejection of the affidavit was entirely proper.  Further, to the extent Blue would have this Court consider Cooper's affidavit de novo, such is precluded by Federal Rule of Evidence 606(b).

That aside, Blue's claim that the jury was precluded from considering "residual doubt" evidence is without merit.  First, the Supreme Court has recently reiterated that a capital defendant has no constitutional right "to introduce at sentencing[,] evidence designed to case 'residual doubt' on his guilt of the crime of conviction."  *Oregon v. Guzek*, 546 U.S. 517, 525 (2006).  *See also Franklin v. Lynaugh*, 487 U.S. at 171-76 (White, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ.) (federal constitution does not require consideration by capital sentencing juries of "residual doubts" about a defendant's guilt because such doubts do not involve a defendant's character, record or a circumstance of the offense); *id.* at 187-88

(O'Connor, J., joined by Blackmun, J.) ("residual doubt" about the defendant's guilt is not a mitigating circumstance").

More importantly, on direct appeal, the Court of Criminal Appeals reasonably concluded that Blue had not demonstrated that he was in any way precluded from presenting the evidence or that the jury was, in fact, precluded from considering it in contravention of the Eighth Amendment. *See Blue II*, 125 S.W.3d at 502-03 (citing *Franklin*, 487 U.S. at 172-76 (even if a constitutional right exists to have "residual doubt" considered as a mitigating factor, the trial court did not impair the defendant's exercise of that right and the special issues did not preclude the jury from given mitigating effect to any "residual doubt"); *see also* 11 RR 124-26. Ultimately, in rejecting this claim, the court wrote:

> [A]fter making a common-sense evaluation of th record, particularly the overwhelming evidence that [Blue] did not have [Carmen's] consent to enter her apartment, we cannot say that there is a reasonable likelihood that the trial court's failure to submit [Blue's] requested instructions, coupled with the instructions that were actually submitted by the trial court, prevented the jury from considering constitutionally relevant mitigating evidence.

*Blue II*, 125 S.W.3d at 503-04 (citing *Ex parte Tennard*, 960 S.W.2d at 57). This rejection was not objectively unreasonable. *See Boyde v. California*, 494 U.S. 370, 381 (1990) (finding no Eighth Amendment error because the catchall instruction — which directed the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime" — did not prevent the jury from considering evidence of Boyde's deprived childhood, academic deficiencies, and good character); *see also Brown v. Payton*, 544 U.S. 133, 142 (2005) (explaining once again that "any other circumstance" meant *anything* which might reduce

-50-

culpability, pre- or post-crime).

For all of these reasons, Blue is not entitled to federal habeas relief on this claim.

**V.     Blue Has Entirely Failed to Demonstrate Any Form of Prosecutorial Misconduct Such that a New Trial is Warranted.   (Claim 5).**

Blue alleges two types of prosecutorial misconduct: subornation of perjury and suppression of evidence.  Petition at 31-32.  For the reasons discussed below, the state court's rejection of these claims was not objectively unreasonable.  28 U.S.C. § 2254(d).  Therefore, Blue is not entitled to federal habeas relief.

**A.     Blue's allegation of subornation of perjury is nothing more than rank speculation.**

Blue alleges that his conviction and death sentence are unconstitutional as they are based on the false statements of various prosecution witnesses.   Petition at 31-32. Specifically, and without offering any supporting evidence, Blue contends that the testimony of Lidge Richards (Carmen's brother), Janet Richards and Beverly Gooden (Carmen's sisters) "was exaggerated, misleading, and gave a very damaging false impression to the jury" as to the state of Blue's relationship with Carmen.  *Id*.  He goes on to suggest that "these, and perhaps other witnesses, were encouraged, either explicitly, implicitly or tacitly to slant their rather subjective testimony in favor of a cessation of [his] relationship with [Carmen]."  *Id*. at 32.  Putting aside the entirely conclusory nature of this claim, it is without merit.

By this claim, Blue asserts a violation of *Giglio v. United States*[31] and *Napue v. Illinois*.[32]  Petition at 31-32.  Due process prohibits the state from knowingly using perjured testimony at trial or from allowing untrue testimony to go uncorrected.  *See Giglio*, 405 U.S. at 153; *Napue*, 360 U.S. at 269.  To obtain relief, the defendant must show that (1) the testimony was actually false; (2) the State knew it was false; and (3) the testimony was material.  *See Knox v. Johnson*, 224 F.3d 470, 477 (5th Cir. 2000) (citing *Giglio*, 405 U.S. at 153); *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996) (citation omitted).  False testimony is material if there is a reasonable likelihood that the false testimony could have affected the judgment of the jury.  *Creel v. Johnson*, 162 F.3d 385, 391 (5th Cir. 1998); *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993).

Blue's state habeas counsel "admitted during the April 22, 2004[,] evidentiary hearing that he had no evidentiary support" for his *Giglio* claims.  5 SHTr (2004) 498 (Findings of Fact, ¶ 27) (citing Evidentiary Hearing ("EH") (April 22, 2004) RR 46-50).   The lack of supporting evidence continues in these proceedings;  Blue's claim is nothing but naked speculation.  As such, it cannot be the basis for federal habeas relief.  *See Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) (noting that "mere conclusory allegations do not raise a constitutional issue in a habeas proceeding"); *Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (noting that claims which are "unsupported by specifics are subject to summary dismissal").

---

[31]     405 U.S. 150 (1972).

[32]     360 U.S. 264 (1959).

Further, Blue's 1995 trial counsel, John Quinn, stated via affidavit:

> I was not aware then, and I am not currently aware, of any improper influences allegedly made by the prosecution to a member of [Carmen's] family who testified. The instant case was my third capital case that I tried against District Attorney Bill Turner. Mr. Turner's goal has always been to try an error free case. I do not believe that Mr. Turner would do anything to jeopardize the finality of a capital murder conviction, such as by influencing a witness' testimony[.]

3 SHTr (2004) 266-70 (State's Exhibit A). The state habeas court deemed this affidavit credible. *See* 6 SHTr (2004) 503 (Findings of Fact, ¶ 30).

A prosecutor from both the 1995 trials and the 2001 re-trial on punishment also provided an affidavit during the state habeas proceedings. Glynis Gore flatly denied "encourag[ing] witnesses to give untruthful testimony." 3 SHTr (2004) 281-82 (State's Exhibit B). Again, this affidavit was deemed credible. *See* 6 SHTr (2004) 503 (Findings of Fact, ¶ 31).

Blue has done nothing to rebut the presumption of correctness afforded these credibility choices as required by § 2254(e)(1). When coupled with state habeas counsel's admission that he had no evidentiary support even then, this is fatal to Blue's claim. On this record, Blue simply has not established that any of the named witnesses testified falsely, much less that the State knew about it or encouraged it. *See* 6 SHTr (2004) 529 (Conclusions of Law, ¶ 113).

For these reasons, the state court's rejection of Blue's *Giglio* claim was not objectively unreasonable. 28 U.S.C. § 2254(d). Therefore, federal habeas relief is not

warranted.

**B.    Blue has entirely failed to establish that the State suppressed any evidence; therefore, this claim must fail.**

Woven into Blue's *Gigilio* claim is an allegation that the prosecution knew or might have known of bias against the defendant harbored by several of the witnesses.  Petition at 32.   Carmen's family, Blue suggests "may have voiced a bias against [him] within the hearing of members of the prosecution team."  *Id*.   And Reba Kendall, a jailer, "had a bias against [Blue] known to members of the prosecution team, not disclosed to the defense."  *Id*.

To establish a due process violation arising from the State's failure to disclose material exculpatory evidence, Blue must demonstrate that (1) the prosecution suppressed evidence; (2) the evidence was favorable to him; and (3) the evidence was material either to guilt or punishment.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  *Brady*'s disclosure requirements extend to materials that may be used to impeach a witness. *Strickler v. Greene*, 527 U.S. 263, 282 n.21 (1999). The prosecution, however, has no duty "to make a complete and detailed accounting to defense counsel of all investigatory work done."  *Blackmon v. Scott*, 22 F.3d 560,  565 (5th Cir. 1994) (citations omitted).   Finally, evidence is constitutionally "material" "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).  *See also Miller v. Dretke*, 404 F.3d 908, 913-16 (5th Cir. 2005) (emphasizing the "reasonable probability" prerequisite to materiality). "The mere possibility that an item of undisclosed information might have helped the defense,

or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-10 (1976). Rather, the suppression must undermine confidence in the outcome of the trial. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

As an initial matter, regarding the challenge to the testimony of Carmen's family, it is incredible that Blue could allege a federal constitutional violation on these facts. Blue killed Carmen by dousing her with gasoline and setting her on fire. When the State charged him with murder during the course of committing or attempting to commit burglary, Blue contended that his relationship with Carmen was ongoing. Therefore, he had her consent to enter her apartment that morning, defeating the State's case for capital murder. To prove its case, the State called several witnesses, including Carmen's brother and two sisters, to testify that Carmen and Blue's relationship was very much over but that Blue could not accept that. Now Blue asserts that these witnesses might have voiced some bias against him, and the prosecution did not divulge this. *Brady* requires the disclosure of evidence known to the State and *unknown* to the defense. *Agurs*, 427 U.S. at 103. It is hardly out of bounds to suggest that this information was not unknown.

In any event, as with the *Giglio* claims, Blue's state habeas counsel admitted having no evidentiary support for the *Brady* claims. 5 SHTr (2004) 498 (Findings of Fact, ¶ 27) (citing EH (April 22, 2004) RR 46-50). The lack of supporting evidence continues in these proceedings. Blue's claim is nothing but naked speculation. This alone is enough to deny

-55-

federal habeas relief.  *See Ross*, 694 F.2d at 1012; *Blackledge*, 431 U.S. at 74.  But there is

record evidence that the State did not violate its duty under *Brady*.

Blue's 1995 trial counsel stated that it was his belief that the District Attorney would

not jeopardize a capital murder conviction "by failing to turn over exculpatory evidence to

the defense." 3 SHTr (2004) 266-70 (State's Exhibit A).  As noted above, the state habeas

court deemed this affidavit credible.  *See* 6 SHTr (2004) 503 (Findings of Fact, ¶ 30).  And

two members of the prosecution team categorically denied withholding evidence.  Glynis

Gore, who participated in both the 1995 trial and the 2001 re-trial, wrote:

> [Blue] makes the broad assertion that the State did not divulge all exculpatory
> or mitigating evidence to the defense.  This is [] not true.  This office has an
> open file policy, which was followed in this case.  To prevent the defense team
> from later claiming that evidence was withheld, I personally required defense
> counsel to sign a discovery receipt acknowledging what discovery they
> received.  Attached to this affidavit are copies of discovery receipts showing
> all evidence that was turned over to the defense.

3 SHTr (2004) 281-300; 4 SHTr (2004) 301-43 (State's Exhibit B).   This affidavit was

deemed credible.  *See* 6 SHTr (2004) 503 (Findings of Fact, ¶ 31).  Shane Phelps, prosecutor

for the 2001 re-trial, echoed Gore's statements regarding the district attorney's open-file

policy.  *See* 4 SHTr (2004) 345-47 (State's Exhibit C).  As with the other affidavits speaking

to Blue's claims of prosecutorial misconduct, this one too was found credible.  *See* 6 SHTr

(2004) 504 (Findings of Fact, ¶ 32).

Finally, Reba Kendall, the jailer, submitted an affidavit in which she denied any

personal bias against Blue: "Blue was simply not cooperating on the morning of October 2nd.

I was merely doing my job." *See* 4 SHTr (2004) 367-68 (State's Exhibit H).  The court found this credible.  *See* 6 SHTr (2004) 504-03 (Findings of Fact, ¶ 33).   And again, Blue simply makes no effort to rebut the presumption of correctness afforded the state court's credibility choices.  Thus, Blue cannot even establish that the prosecution withheld any evidence.

Ultimately, the state habeas court rejected these claims as having "no basis in the record" and being "completely baseless."  6 SHTr (2004) 529 (Conclusions of Law, ¶ 115).   This rejection of Blue's *Brady* claims was not objectively unreasonable.  28 U.S.C. § 2254(d).  Therefore, federal habeas relief is not warranted.

**VI.    Blue's Claims of Ineffective Assistance of Counsel at the 1995 Trial on Guilt/Innocence are Procedurally Barred.  In any Event, the State Court's Rejection of These Claims was Not Objectively Unreasonable.  (Claims 6, 15).**

Blue next alleges that his 1995 trial counsel were ineffective because they (1) did not discover and present evidence tending to establish that Carmen and Blue's relationship was "strong, long-lasting and ongoing," (2) failed to investigate the State's "improper influence upon the testimony of the victim's family," (3) failed to challenge Williams' credibility with evidence of his "full and complete" criminal history, (4) gave up on Blue's case as hopeless, and (5) tried his case while under the influence of alcohol and/or hung over.  Petition at 33; *see also* Petition at 105.  Aside from being wholly baseless, these claims are procedurally barred.

A.     **Because the state court dismissed these claims as an abuse of the writ, this Court is precluded from considering them.**

As the state habeas court pointed out, these specific allegations were not made in Blue's first state habeas application, despite having made a more general allegation of ineffective assistance broken down into 42 discrete instances. *See* 6 SHTr (2004) 531 (Conclusions of Law, ¶¶ 121-22); *see also* SHTr (1997) 418-39. Thus, these claims were found to be an abuse of the writ. *See* 6 SHTr (2004) 531 (Conclusions of Law, ¶ 122) (citing Tex. Code Crim. Proc. art. 11.071, § 5(a)). As discussed more fully above, it is well-established that Texas' abuse-of-the-writ doctrine constitutes an adequate and independent state ground on which to deny federal habeas relief. Ultimately, however, the state habeas court concluded that Blue established neither deficient performance nor prejudice. *Id*. at 531-32 (Conclusions of Law, ¶ 123). This rejection was not an unreasonable application of clearly established Federal law.

B.     **Blue was not denied constitutionally effective assistance.**

To establish a Sixth Amendment ineffective assistance of counsel violation, Blue must affirmatively prove both that: (1) counsel rendered deficient performance, and (2) counsel's actions resulted in actual prejudice. *Strickland v. Washington*, 466 U.S. 668, 687-88, 690 (1984). Importantly, failure to prove either deficient performance or prejudice will defeat an ineffective assistance of counsel claim, making it unnecessary to examine the other prong. *Strickland*, 466 U.S. at 687.

-58-

In order to demonstrate deficient performance, Blue must show that, in light of the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness," *i.e.*, "prevailing professional norms." *Strickland*, 466 U.S. at 689-90; *see also Nix v. Whiteside*, 475 U.S. 157, 165 (1986). The Supreme Court has admonished that judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effect of hindsight." *Strickland*, 466 U.S. at 689-90; *see also Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.") (citations omitted). Accordingly, there is a "strong presumption" that the alleged deficiency "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even if deficient performance can be established, Blue must still affirmatively prove prejudice that is "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. This requires to Blue to show a reasonable probability that, but for counsel's deficiencies, the result of the proceeding would have been different. *Id*. at 694. A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Id*. The mere possibility of a different outcome is insufficient to prevail on the prejudice prong. *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999).

On this record, Blue cannot make either showing. Blue has presented no competent evidence to support any of the claims. A petitioner's mere conclusory and speculative

allegations of ineffective assistance will not entitle him to habeas relief.  *See Kinnamon v. Scott*, 40 F.3d 731, 734-35 (5th Cir.) (finding "speculation" of ineffective assistance to be no basis for habeas relief); *Barnard v. Collins*, 958 F.2d 634, 643 n.11 (5th Cir. 1992) (holding that "conclusory allegations" of ineffective assistance are without merit "[i]n the absence of a specific showing of how these alleged errors and omissions were constitutionally deficient, and how they prejudiced his right to a fair trial"); *see also Ross*, 694 F.2d at 1012; *Blackledge*, 431 U.S. at 74.

In any event, the state habeas court made the found that counsel did, in fact, present evidence that Blue and Carmen were still in a relationship on August 19, 1994 during trial. *See* 6 SHTr (2004) 513-14 (Findings of Fact, ¶ 55) (citing 16 RR (1995) 339, 473, 496, 497; 17 RR (1995) 470, 656, 658, 659).  Further, Blue took the stand during the 1995 punishment trial and told the jury that Carmen was his girlfriend at the time of the murder.  *See id*. at 514 (Findings of Fact, ¶ 56) (citing 21 RR (1995) 530-31).   There can be no deficient performance where counsel did exactly what he is accused of not doing.

Regarding Blue's claim that counsel failed to challenge Williams' credibility with a "full and complete criminal history," trial counsel explained that he knew of Williams' criminal history but

> was not able to impeach [him] [as to one of the convictions] because Williams had completed his probation at the time of trial [] and had not been subsequently convicted of a felony or a crime of moral turpitude at the time of trial.  See former Tex. R. Crim. Evid. 609(c)(2), now Tex. R. Evid. 609(c)(2). I was not able to impeach Williams with the other instances of his criminal history simply because the arrests for theft and unlawful carrying of a weapon

were not convictions, and the marijuana conviction was not a misdemeanor involving moral turpitude. See former Tex. R. Crim. Evid. 609(a).

3 SHTr (2004) 266-70 (State's Exhibit A). See 6 SHTr (2004) 503 (Findings of Fact, ¶ 30) (finding affidavit credible). As the Fifth Circuit has long recognized, "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." Kitchens v. Johnson, 190 F.3d 698, 701 (1999) (quoting Green v. Johnson, 116 F.3d 1115, 1122 (5th Cir. 1997)).

Blue next accuses counsel of having given up on his case as hopeless.  To which trial counsel responded:

> Two weeks before trial, the State provided us with notice of numerous extraneous offenses per Tex. R. Evid. 404(b), as well as the corresponding police reports.  We investigated the extraneous offenses and found that they were true.  As a result, we had to limit our cross-examination of some of the State's witnesses because we did not want to open the door to those extraneous offenses at guilt-innocence.  Consequently, we went from and aggressive stance to a damage control stance.  However, at no time did we give up hope.

3 SHTr (2004) 266-70 (State's Exhibit A). See 6 SHTr (2004) 503 (Findings of Fact, ¶ 30). This kind of decision cannot support a finding of deficient performance. See Williams v. Cain, 125 F.3d 269, 278-79 (5th Cir. 1997) ("failure to present . . . evidence would not constitute 'deficient' performance within the meaning of Strickland if . . . [counsel] could have concluded, for tactical reasons, that attempting to present such evidence would be unwise.").

Blue's last claim of ineffective assistance is based solely on the affidavit of former

court reporter Deborah Cotie, in which she states:

> I had noted that Rob Neal was not focused nor seemed aware of the
> significance of many of the events taking place during the trial.  For instance,
> it was customary for [Neal] to report in to the court's staff office to let us know
> he was present for the proceedings each day. [Neal] would stand at my desk
> to speak to me.  I noted on more than one occasion during [Blue's] trial that
> Mr. Neal appeared to have the smell of alcohol on his breath.  I would ask him
> if he had been partying the previous night.  He often would discuss his
> activities of the evening and admit he had been out "partying." The "partying"
> was commonplace for him since I had known him he would often joke about
> his escapades.  During [] trial, on more than one occasion [Neal] stood there
> in front of my desk and stated he was "hung over" while he would be putting
> drops in his eyes to take the red out.  On one of those occasions I asked him
> whether or not he should be doing this at night during such and important trial
> and we ended up just laughing it off.  I concluded that this was probably why
> Mr. Neal seemed to have such a difficult time being focused and alert during
> the trial.

Petition at 106-07 n.8.[33]  The same affidavit was presented during the state habeas

proceedings.  *See* 1 SHTr 76-77.  The state habeas court rejected it in its entirety, finding that

"Cotie has a biased, personal relationship in favor of [Blue], which was not revealed in her

affidavit."  6 SHTr (2004) 516 (Findings of Fact, ¶ 66).  *See also id*. at (Findings of Fact, ¶

63) ("Cotie is one of five people on [Blue's] list of those who may visit him at the Polunsky

Unit."  And finding Blue's explanation for putting her on his visitor's list as "She love me

---

[33]     Interestingly, Cotie never brought her concerns to the attention of Judge
Delaney, instead waiting eight years to say anything.  *See* 4 SHTr (2004) 360-62 (State's
Exhibit F) ("If such concern had been brought to my attention, I would have immediately met
with the lawyer, determined the validity of the claim and taken remedial action, if needed.").

and have not seen me in 5 years and she would like to visit me and, I love her and I would

like to see her."); (Findings of Fact ¶ 64) (visitor's log indicates eight visits by Cotie in eight

months).

That aside, Rob Neal responded to Cotie's attack, and categorically denied "partying"

the night before trial or having alcohol on his breath:  "I was representing a man facing the

death penalty; I took my job very seriously." 4 SHTr (2004) 357-58 (State's Exhibit E).[34]

The state habeas court found this affidavit credible. 6 SHTr (2004) 518 (Findings of Fact,

¶ 69).

Even if Blue had met his burden regarding deficient performance, he certainly cannot

establish prejudice such that the guilty verdict from that 1995 trial is undermined.  *See*, *e.*g.,

*Strickland*, 466 U.S. at 698 (no prejudice due to State's overwhelming evidence on

aggravating factors supporting the death penalty); *Jones v. Johnson*, 171 F.3d 270, 277(5th

Cir. 1999) (no prejudice due to brutal facts of murder); *Sharp v. Johnson*, 107 F.3d 282,

287(5th Cir. 1997) (same); *Russell v. Lynaugh*, 892 F.2d 1205, 1213 (5th Cir. 1989) (finding

no ineffective assistance "[g]iven the weakness of such testimony when juxtaposed with the

---

[34]        Lead counsel John Quinn also responded to Cotie's accusations: "I would not
have allowed Mr. Neal to come to court "hung over," nor would have Judge Delaney.  I
spoke with Mr. Neal every day; at no time did I smell alcohol on his breath.  After trial for
the day was over, Mr. Neal and I always met to discuss the next day's events and prepare for
the next day.  This would take several hours.  Consequently, Mr. Neal was working well into
the night and did not have time to go out and party." 3 SHTr (2004) 266-70 (State's Exhibit
A). As well, Glynis Gore and the courtroom bailiff flatly denied that Neal was ever drunk or
hung over in their presence.  6 SHTr (2004) 519-20 (Findings of Fact, ¶¶ 73-74).

overwhelming evidence of guilt, the horrifying nature of the crime, and the abundant impeachment material available to the State").

For all of these reasons, federal habeas relief must be denied.

## VII.   Blue's Several Challenges to the Future Dangerousness Special Issue are Baseless.  (Claims 7, 8, 17, 19).

The future dangerousness special issue asks the jury to determine whether "from the evidence beyond a reasonable doubt [] there is a probability that the defendant [] would commit criminal acts of violence that would constitute a continuing threat to society?"  Tex. Code Crim. Proc. art 37.071(b)(1); *see also* IV CR 796; V CR 823.  This question has not changed since it was first approved  of  in *Jurek v.Texas*, 428 U.S. at 274-75.

-64-

### A.    The evidence was more than sufficient to support the jury's affirmative answer to the future dangerousness special issue. (Claim 7).[35]

Blue first challenges the sufficiency of the evidence supporting the jury's finding that the State had proven his future dangerousness beyond a reasonable doubt.  Petition at 33-52.  But as the state court found, the case for future dangerousness was more than sufficient.[36]

In reviewing Blue's second death sentence, the court first outlined the standard of review: "This claim requires the Court to view the evidence in a light most favorable to the jury's finding and then determine whether any rational trier of fact could have found beyond

---

[35]    Elsewhere in his petition, Blue makes the bold statement that "Texas no longer undertakes any meaningful review of the first special issue."  Petition at 109 (Claim 17) .  This challenge fundamentally misapprehends the law.  Appellate review of the sufficiency of the future dangerousness evidence is conducted under the standard announced in *Jackson v. Virginia*, 443 U.S. 307.  *See, e.g.*, *Blue II*, 125 S.W.3d at 493; *Blue I*, slip op. at 5; *Allridge v. State*, 850 S.W.2d 471, 487 (Tex. Crim. App. 1991).  *Jackson* demands that the evidence be reviewed in the light most favorable to the prosecution.  443 U.S. at 324.  Moreover, it is this *eligibility* decision that must be made with "maximum transparency" to "make rationally reviewable the process for imposing the sentence of death."  *Tuilaepa*, 512 U.S. at 973.  *See id*. at 972 (explaining that to find a defendant "death eligible," "the trier of fact must convict [him] of murder and find one aggravating circumstance (or its equivalent) at either the guilt or penalty phase.").  Texas provides that the eligibility decision is made primarily at the guilt/innocence trial.  *Jurek*, 428 U.S. at 268-72; Tex. Penal Code § 19.03.

Blue's claim that Texas has "retreated from appellate review" is based on the seemingly truncated review the court performed in *Blue II*.  As discussed below, however, the court's review was not as Blue avers.

[36]    To the extent Blue is alleging factual sufficiency, such is not cognizable on federal habeas review.  "Factual insufficiency" is strictly a creation of Texas state law under which an appellate court examines the fact-finder's weighing of the evidence.  *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996).  Because this is strictly a state-law rule, it plays no part in a federal habeas court's evaluation of evidentiary sufficiency.  *Pemberton v. Collins*, 991 F.2d 1218 (5th Cir. 1993); *Brown v. Collins*, 937 F.2d 175, 181 (5th Cir. 1991); *Schrader v. Whitley*, 904 F.2d 282, 284 (5th Cir. 1990); *Thompson v. Lynaugh*, 821 F.2d 1054, 1062 (5th Cir. 1987).

a reasonable doubt that there is a probability that [Blue] would commit criminal acts of violence that would constitute a continuing threat to society." *Blue II*, 125 S.W.3d at 493 (citing *Jackson v. Virginia*, 443 U.S. 307; *Allridge v. State*, 850 S.W.2d at 487).   The court then decided "as we did before, that the facts of the offense and the other evidence of [Blue's] prior history of violence are sufficient to support the jury's affirmative finding on the 'future dangerousness' special issue." *Id.* at 496.   The court specifically noted that any differences between the evidence presented in the first and second trials was relatively insignificant. *Id.* at 494 n.4.   In *Blue I*, the court summarized the evidence to support the jury's finding of future dangerousness:

> The facts of the instant case show a premeditated, calculated plan to kill Richards regardless of who might be there.  The forethought and deliberation with which the twenty-nine year old [Blue] carried out his plan showed no indication of duress or domination by another person.  Furthermore, although the State did not present any evidence of prior convictions, it did prove that [Blue] had a history of violence not only in his relationship with Richards, but in past relationships.  One woman testified that [Blue] would hit her with his fists and kick her.  She further described different instances when [Blue] sexually assaulted her, threatened to kill her, and broke into her house.  A second woman also told the jury about occurrences in which [Blue] would beat her.  During one of these incidences, [Blue] beat her while she was eight months pregnant and cocked a gun and put it to her head threatening to kill her.  The woman further related times when [Blue] kicked her in the ribs and when he hit her in the face and jaw until she was unable to eat.
>
> Bryan Police Officer Mark Barnett related an instance when he tried to place [Blue] under arrest and [Blue's] response was to violently struggle with him and attempt to kick him.  Several other officers also testified to various times when they tried had tried to detain or arrest [Blue] and he had taken off running, showing a complete lack of respect for authority.  Finally, John Erskin testified that [Blue] had been outside of his home waving a gun around and repeatedly saying, "I'm gonna kill that bitch."

Slip op. at 6-7.  The court also took note of the State's evidence that Blue had been "a disciplinary problem while he was incarcerated in the county jail for the new punishment hearing." *Blue II*, 125 S.W.3d at 494.

On this record, the state court's determination is not objectively unreasonable. Nothing Blue argues undermines that rejection; he is therefore not entitled to federal habeas relief.

**B.      Blue is not actually innocent of the death penalty. (Claim 8).**

Blue's claim of actual innocence is predicated on the fact that there is "newly discovered evidence" that he is not "likely to commit acts of violence such as to constitute a continuing threat to society."  Petition at 52-54.  Thus, Blue asserts the jury's prediction was simply wrong.

> It is, of course, not easy to predict future behavior.  The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system.

*Jurek*, 428 U.S. at 274-75 (opinion of Stewart, J., joined by Powell and Stevens, JJ.).

In deciding the appropriate punishment for a defendant found guilty of a capital crime, the jury is asked to consider the future dangerousness the defendant.  In that consideration,the Fifth Circuit has recognized that "a jury could give effect to good character evidence." *Beazley*, 242 F.3d at 260; *see also Nichols v. Scott*, 69 F.3d 1255, 1278 (5th Cir. 1995) ("[a]t the very least, the . . . special issue concerning future dangerousness provide[s] an adequate vehicle for the jury to give effect to this mitigating evidence, placing it within the effective

reach of the sentencer, and there is no reasonable likelihood that the jury would have found itself foreclosed from thus considering it."); *Jacobs v. Scott*, 31 F.3d 1319, 1327 (5th Cir. 1994) ("[a]s for [a defendant's] alleged positive character traits, a jury wishing to give effect to such traits could answer 'no' to the . . . special issue regarding future dangerousness.").

Here, there can be no dispute that the jury was presented with ample evidence of Blue's good character and behavior after his arrest and during his incarceration while he was awaiting trial. *See* 6 SHTr (2004) 525 (Findings of Fact, ¶ 98) (finding that "the jury heard evidence that [Blue] was respectful and/or well behaved while on death row" (citing 9 RR 111, 137, 149, 170, 203)). They nevertheless found he constituted a threat to society. *Id*. at 534 (Conclusions of Law, ¶ 132) (because the jury heard evidence of good behavior "it was able to consider [Blue's] evidence and arguments, but rejected [them] when they answered the special issues in such a way that death would result"). *See also* IV CR 796; V CR 821-28. Blue castigates this finding based on what can only be characterized as merely evidence he has been, essentially, a model prisoner since arriving on death row. This is materially indistinguishable from the evidence presented to the jury in 1995. *See* 6 SHTr (2004) 535 (Conclusions of Law, ¶ 135 (concluding the evidence would be merely cumulative). As such, it not is does not rise to the level of "new" evidence, much less "clear and convincing evidence" necessary to imbue the jury's finding with doubt.

The absurdity of what Blue is asking cannot be overstated. At the end of the day, Blue is arguing that because he has been well-behaved for the last seven years, the jury's original

determination that he would be a future danger is invalid.  Thus, he is apparently seeking a new punishment hearing so that another jury might be empaneled to hear this "newly discovered evidence" and weigh it against the evidence of a man who's long history of violently abusing the women in his life culminated in the most horrific murder of Carmen Richards-Sanders.

Because Blue has not demonstrated that he is actually innocent of the death penalty, he is not entitled to federal habeas relief on this claim.

C.   **The principles of fair notice and due process are not implicated in the instant case because Blue was fully informed of the statutory elements of capital murder and the aggravating factors necessary to impose the death penalty.  Both the elements of the offense and the aggravating factors were presented and proved to his jury beyond a reasonable doubt. (Claim 14).**

Again citing to *Apprendi* and *Ring*, Blue urges that the State is required to list — in the indictment —  the evidence, *i.e.* extraneous unadjudicated conduct, that it might use to prove the case for future dangerousness.  Petition at 99-105.  The state habeas court flatly rejected this claim.  *See* 6 SHTr (2004) 533-34 (Conclusions of Law, ¶ 129) (citing *Rayford v. State*, 125 S.W.3d 521, 533 (Tex. Crim. App. 2003); *Prystash v. State*, 3 S.W.3d 522, 534 (Tex. Crim. App. 1999)).  As discussed below, this rejection was certainly not objectively unreasonable.

Unlike the state action at issue in *Apprendi*, Texas did not breach its obligation to provide Blue fair notice of the elements of the charged offense and the possible punishment.  In *Apprendi*, the petitioner pled guilty to two counts of "second-degree possession of a

firearm for an unlawful purpose" and one count of third-degree "unlawful possession of an antipersonal bomb" after he fired multiple shots into the New Jersey home of an African-American family. 530 U.S. at 469. Though a second-degree offense under New Jersey law carried a maximum sentence of *ten* years, *id*. at 470, the trial judge increased the sentence on one of the second-degree offenses to *twelve* years based on the state's "hate crimes" statute, which required the judge to increase the sentence by up to twenty years if the judge found, by a preponderance of the evidence, that the underlying crime was motivated by racial hatred. *Id*. at 468-69 (citing N.J. STAT. ANN. § 2C:44-3(c) (West 2001)). Because the firearms statute  and the "hate crimes" statute essentially constituted two separate offenses with distinct elements and punishments, *id*. at 476, Apprendi appealed the sentence enhancement alleging that due process required, first, that any racial bias under the "hate crimes" enhancement statute be determined by a jury rather than a judge and, second, that the racial bias be proven beyond a reasonable doubt before the sentence on the possession charge could be increased beyond the statutory maximum. *Id*. at 469, 471.

The Supreme Court agreed with Apprendi, ruling that the New Jersey statute violated "basic principles" requiring trial to a jury of "all facts necessary to constitute a statutory offense, and proving those facts beyond a reasonable doubt." *Id*. at 470-71, 483-84, 497. "Other than the fact of a prior conviction," the Court explained, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." *Id*. at 490. By sidestepping its constitutional duty to

inform Apprendi of all the elements of each offense and labeling the hate crime offense as a "sentencing factor," New Jersey removed from the jury's consideration Apprendi's state of mind or "purpose"– a substantive element of a distinct crime – and lessened the State's burden of proof on that element. *Id*. at 478, 490-93. The Court held the maneuver unconstitutional because the state effectively allowed a jury conviction of a second-degree offense to be punished as a first-degree offense without allowing the jury to consider the additional factual element. *Id*. at 491-93.

Two years later, in *Ring*, the Supreme Court struck down Arizona's capital murder sentencing scheme on the ground that "[c]apital defendants, no less than non-capital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 588-89 (quoting *Apprendi*, 530 U.S. at 483). This case, too, is drastically different from Blue's.

Ring was convicted of the lesser-included offense of felony murder because the evidence tied him only to the proceeds of an armored car robbery, not the murder of the driver of the car. *Id*. at 589-93. To obtain a death sentence for first-degree murder, Arizona law provided that the trial judge alone had to make further findings following a separate sentencing hearing. *Id*. at 592. Such a hearing was held in Ring's case, the result of which persuaded the trial judge to sentence Ring to death after entering the following findings: (1) Ring shot and killed the murder victim; Ring was "a major participant in the robbery;" (2) Ring committed the murder in order to obtain cash proceeds from the robbery; (3) Ring

committed the offense "in an especially heinous, cruel or depraved manner," and (4) Ring's minimal criminal record failed to warrant leniency. *Id*. at 594-95.

In striking down the manner in which Arizona law allowed Ring to be sentenced to death, the Court noted that the jury verdict of first-degree felony murder would have subjected Ring to a maximum punishment of life imprisonment, not death. *Id*. at 597. Thus to that extent, the Arizona statute was unconstitutional. Moreover, to the extent that same statute allowed the sentencing judge, rather than a jury, to find an *aggravating circumstance*– Ring's state of mind– as a prerequisite to a death sentence, it was unconstitutional. *Id*. at 609. For the reasons set forth in *Apprendi*, the Court explained that the Constitution not only obligates the state to allow a jury to determine whether the death penalty was warranted but also requires the state to prove it beyond a reasonable doubt. *Id*. at 602 ("If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact– no matter how the State labels it– must be found by a jury beyond a reasonable doubt. . . . A defendant may not be 'expose[d] . . . to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone.'" (quoting *Apprendi*, 530 U.S. at 483, and citing to *id*. at 499 (Scalia, J., concurring) ("[A]ll the facts which must exist in order to subject the defendant to a legally prescribed punishment *must* be found by the jury.")).

The state actions overturned in *Apprendi* and *Ring* are nonexistent in the case at hand because each element of capital murder was indicted, submitted to Blue's jury, and proven

beyond a reasonable doubt.  Thus the prerequisites to reaching the punishment phase of the trial were met.  Certainly, Blue was on notice as to each of those elements:  they are set forth in the Texas capital murder statute and were tracked in both the indictment and the court's guilt-innocence charge.  *Compare* Tex. Penal Code §§ 19.02(b)(1) & 19.03(a)(2) *with* I CR 1; II CR 210-18.  Blue was also aware that the prescribed maximum penalty for capital murder is death.  Tex. Penal Code §§ 12.31(a), 19.03(b).  And once Blue's trial proceeded to the punishment phase, the trial court submitted the future dangerousness special issue to the jury according to Texas law.  IV CR 796; V CR 823; *see also* Tex. Code Crim. Proc. art. 37.071 § 2(b)(1). As required by statute, the jury was instructed that "the State has the burden to prove beyond a reasonable doubt"  there is a probability that Blue would commit criminal acts of violence that would constitute a continuing threat to society.  IV CR 795; *see also* Tex. Code Crim. Proc. art. 37.071 § 2(c).  Thus, Texas law did not rely on an improper bypass to the Sixth and Fourteenth Amendment protections outlined in *Apprendi* to determine Blue's guilt and punishment.

> **C.**    **That the future dangerousness special issue does not define the terms "probability" or "criminal acts of violence" does not offend the Constitution.  (Claims 7, 19).**

The Supreme Court has long held Texas' future dangerousness special issue to be constitutional, despite its use of the word "probability."  *See Jurek*, 428 U.S. at 279 (White, J., concurring in judgment) ("[T]he issues posed in the sentencing proceeding have a common sense core of meaning and . . . criminal juries should be capable of understanding

them."); *see also Tuilaepa*, 512 U.S. at 973-75; *Arave v. Creech*, 507 U.S. 463, 472 (1993).

Simply because the State is required to prove beyond a reasonable doubt that there is a

*substantial likelihood* that Blue would commit future acts of violence does not undercut that

burden. As the Court of Criminal Appeals has held,

> [W]e have held that the inclusion of the term "probability" does not render the
> future dangerousness special issue unconstitutional. *Robison v. State*, 888
> S.W.2d 473, 481 (Tex. Crim. App. 1994). The State must still prove *beyond
> a reasonable doubt* that there is a probability that the defendant will be a
> continuing threat to society. *Id*. This is constitutionally sufficient. *Id*.

*Rayford v. State*, 125 S.W.3d at 534; *see also Kemp v. State*, 846 S.W.2d 289, 309 (Tex.

Crim. App. 1992 (*en banc*) ("'To single out the word 'probability' from the language of the

[first] special issue and infer a lessening of the State's burden of proof is to take the word

totally out of context.'") (quoting *Sosa v. State*, 769 S.W.2d 909, 916-917 (Tex. Crim. App.

1989)).

The Fifth Circuit has repeatedly stated that the Constitution does not require

commonly understood terms as used in the Texas special issues be defined. *See*, *e.g.*,

*Nethery v. Collins*, 993 F.2d 1154, 1162 (5th Cir.. 1993) (not necessary to define

"deliberately," "probability," or "society"); *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir.

1993) (not necessary to define "deliberately," "probability," "criminal acts of violence," or

"continuing threat to society"); *Hughes*, 191 F.3d at 615 (failure to define "probability" does

not make the term unconstitutionally vague); *Thompson v. Lynaugh*, 821 F.2d 1054, 1060

(5th Cir. 1987) ("deliberately" and "reasonable doubt" need not be defined as their "common

-74-

meaning is sufficiently clear to allow the jury to decide the special issues on punishment");

*Milton v. Procunier*, 744 F.2d 1091, 1095-96 (5th Cir. 1984) ("deliberately," "probability,"

and "criminal acts of violence" "have a plain meaning of sufficient content that the discretion

is left to the jury" is "no more than that inherent in the jury system itself").

The bottom line is that Blue complains about the adequacy of the future

dangerousness special issue simply because the jury found against him.  His attack lacks any

support by Supreme Court or circuit precedent; thus, the state court's rejection of this claim

was not objectively unreasonable.  28 U.S.C. § 2254(d).

Because Blue is unable to demonstrate the unconstitutionality of Texas' future

dangerousness special issue, federal habeas relief should be denied

## VIII.  The State Court's Failure To Inform The Jury Of The Effect Of A Single Holdout Juror Did Not Violate Blue's Constitutional Rights Under The Eighth and Fourteenth Amendments. (Claims 11, 20, 21).

Blue next challenges the constitutionality of Texas' capital sentencing scheme because

it does not allow jurors to be informed that a single holdout on any special issue

automatically results in a life sentence.  Petition at 86-88; *see also id.* at 122-28, 128-30.

The Court of Criminal Appeals summarily, but reasonably, rejected this claim on direct

appeal.  *Blue II*, 125 S.W.3d at 505 (citations omitted).  For that reason and as explained

below, relief must be denied.

Commonly referred to as the "12/10 Rule," state law requires that the jury be

instructed it can answer "yes" to the special issues only if the decision is unanimous; that is,

all twelve jurors must agree before a death sentence can be imposed.   Moreover, the law

mandates that ten must jurors must agree to answer "no" to any of the special issues.  Tex.

Code Crim. Proc. art. 37.07, § 2(d)(2), (f)(2).[37]   Finally, state law expressly proscribes an

instruction regarding the failure to muster the necessary votes.  *Id*. at § 2(a) ("[t]he court, the

attorney representing the State, the defendant or the defendant's counsel may not inform a

juror . . . of the effect of a failure of a jury to agree on issues submitted under Subsection (c)

or (e) of this Article.").   The idea that simply because the jury is not told of the effect of

single holdout is the equivalent of being told they must reach a decision is untenable.

As a preliminary matter, this claim is barred under *Teague v. Lane*, 489 U.S. 288

(1989).  *See Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000) (per curiam); *Webb v.

Collins*, 2 F.3d 95-96 (5th Cir. 1993) (per curiam).   In any event, the Supreme Court has

expressly held that "the Eighth Amendment does not require that the jurors be instructed as

to the consequences of their failure to agree."  *Jones v. United States*, 527 U.S. 373, 381

(1999).   In so holding, the Court emphasized that a trial court's failure to include an

instruction explaining the result on a jury's deadlock would,  "in no way," "affirmatively

[mislead the jury] regarding its role in the sentencing process."  *Id*. at 381-82 (citing *Romano

v. Oklahoma*, 512 U.S. 1, 9 (1994)).[38]   Indeed,

---

[37]      The jury was instructed in conformity with state law.  IV CR 794-800.

[38]      The Court also rejected the idea that the absence of such an instruction
"prevented the jury from considering [all constitutionally relevant mitigating evidence]."
*Jones v. United States*, 527 U.S. at 381 (internal quotation marks and  citation omitted); *see
also Miller v. Johnson*, 200 F.3d 274, 288-89 (5th Cir. 2000) ("[w]e have concluded that

the proposed instruction has no bearing on the jury's role in the sentencing process. Rather, it speaks to what happens in the event that the jury is unable to fulfill its role - - when deliberations break down and the jury is unable to produce a unanimous sentence recommendation. . . . Petitioner's argument . . . appears to be that a death sentence is arbitrary within the meaning of the Eighth Amendment if the jury is not given any bit of information that might possibly influence an individual juror's voting behavior. That contention has no merit. . . . [W]e have long been of the view that "[t]he very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves." *Allen v. United States*, 164 U.S. 492, 501 (1896). We further recognized that in a capital sentencing proceeding, the Government has "a strong interest in having the jury express the conscious of the community on the ultimate question of life or death." *Lowenfield* [], 484 U.S. [] at 238 [] (citation and internal quotation marks omitted). We are of the view that a charge to the jury of the sort proposed by petitioner might well have the effect of undermining this strong governmental interest.

*Id*. at 382 (footnotes omitted).

Disregarding this precedent, Blue asserts the jury should have been instructed that, should it fail to agree as to punishment, the trial court would automatically impose a life sentence. "'While this was a correct statement of the law [,] it concerned a procedural matter and was not one which should have been the subject of an instruction. It would have been an open invitation for the jury to avoid its responsibility and to disagree.'" *Jones v. United States*, 527 U.S. at 384 (quoting *Justus v. Virginia*, 266 S.E.2d 87, 92-93 (1980)). And as set forth above, such an instruction has been firmly rejected by the Supreme Court. Therefore, Blue's claim must be denied.

---

'[u]nder the Texas system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance.'" (quoting *Jacobs v. Scott*, 31 F.3d 1319, 1329 (5th Cir. 1994)); *Hughes v. Johnson*, 191 F.3d at 625.

XI.   **Blue's Claim that He was Denied the Right to Have His Jury Drawn from a Fair Cross-Section of the Community is Baseless.   Therefore, the State Court's Rejection of it was Not Objectively Unreasonable.  (Claim 12).**

When Blue raised this claim during the state habeas proceedings, it was rejected as procedurally barred because no pre-trial objection had been made.  *See* 6 SHTr (2004) 523 (Findings of Fact, ¶¶ 86-87); 532 (Conclusions of Law, ¶ 126).   "[F]ederal courts are precluded from granting habeas relief where the last state court to consider the claims raised by the petitioner expressly and unambiguously based its denial of relief on an independent and adequate state-law procedural ground."  *Haley v. Cockrell*, 306 F.3d 257, 263 (5th Cir. 2003).   The Fifth Circuit has previously recognized that the Texas contemporaneous objection rule, upon which the state court relied in this case, is an adequate and independent state ground that procedurally bars federal habeas review.  *See Cotton v. Cockrell*, 343 F.3d 746, 754 (5th Cir. 2003) (citing *Haley*, 306 F.3d at 262 n.8); *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999) ("The 'Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars federal habeas review of a petitioner's claims.'") (internal citations omitted)).   In any event, the state court also considered, and reasonably rejected, the merits of the claim.  6 SHTr (2004) 523 (Findings of Fact, ¶¶ 88-90), 532-33 (Conclusions of Law, ¶ 127).

In order to obtain relief on this claim, Blue must demonstrate

(1) that the group alleged to be excluded is a "distinctive" group in the community, (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this [under-representation] is due to

systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).   No doubt, African-Americans are a "distinctive" group for purposes of this claim.   But that aside, the only evidence ever proffered is speculation and/or hearsay.  *See* Petition at 90-95; *see also* 6 SHTr (2004) 523 (Findings of Fact, ¶ 88).

Even putting that aside, Blue has only established two things.   First, African-Americans might not make it to a venire panel because they are disqualified as a matter of law.  *See* Petition at 90 (interview with Lane Thibodeaux, attorney: "When I see names on jury lists with addresses in traditional African-American neighborhoods, a lot of them don't show up.  I don't know why but that's my experience.  Many of the African-Americans that do show up end up being disqualified for criminal justice reasons, i.e., on probation, felony convictions, etc."); 92 (Sheryl Coffman, Brazos County Office of Jury Services: "Minorities seem to show up in lower percentages [than] Caucasians. . . .  I don't really know why[.] It could be [they] are less eligible because of criminal convictions."); 94 (interview with Jody Rodriguez, Brazos County attorney: "I suppose one reason is that there may be some that are disqualified because of criminal convictions.").    And second, Brazos County does not compile statistics regarding the race of those who respond to jury summons'.  *Id*. at 92, 93 (interview with Ginger Linehart, Director, Brazos County Office of Jury Services).  Indeed, Blue does not even offer concrete statistics as to the number of African-American residents of Brazos County.  *Id*. at 95 (arguing that "*if* the interviewee who suggested that [African-

Americans] comprise about 24% of the population [] *is in fact correct*, then the jury panel from which the 2001 jury was selected substantially under represented the African-American population.") (emphasis added).

Given the wholesale speculation underlying this claim, the state court's rejection was not objectively unreasonable. 28 U.S.C. § 2254(d).  Blue is thus not entitled to federal habeas relief.

**X.   Blue's Claim that He was Denied His Right to an Impartial Tribunal is Procedurally Barred from Review by this Court. In any Event, the State Court's Rejection of this Claim was Not Objectively Unreasonable. (Claim 16).**

With nothing more than the affidavit of a single person made "[w]ell after the close of evidence in the 2001 trial, early in 2003," Blue accuses both the court and prosecution — from the 1995 trial — of racial bias against him.  Petition at 105-07.  He boldly states that "an attitude of indifference toward acknowledged unfairness of the trial upon which [Blue's] life depended" was revealed; "[t]his attitude destroys the appearance of fairness and impartiality on which our criminal justice system depends for its very legitimacy." *Id*. at 107. The state habeas court rejected this claim as procedurally barred because Blue could have, but did not, raise it in his original writ application.  6 SHTr (2004) 520 (Findings of Fact, ¶¶ 77-78), 532 (Conclusions of Law, ¶ 124).  As discussed above, it is well-established that Texas' abuse-of-the-writ doctrine constitutes an adequate and independent state ground on which to deny federal habeas relief.  Thus, this Court is precluded from reaching the merits of the claim.

In any event, because Blue challenges the impartiality of his state tribunal, he must show that (1) the judge was influenced by extrajudicial interests and (2) the bias or prejudice resulted in rulings based on other than facts developed at trial. *Nethery v. Collins*, 993 F.2d at 1157 (citing *United States v. Reeves*, 782 F.2d 1327, 1329 (5th Cir.), *modified*, 796 F.2d 100 (5th Cir. 1986); *cf. Liteky v. United States*, 510 U.S. 540, 555 (1994) (construing the federal recusal statute, which establishes a more demanding standard than that established by the Due Process Clause). The conduct of a trial judge can violate due process only where the judge so favors the prosecution that he appears to predispose the jury toward a finding of guilt or to take over the prosecutorial role. *Derden v. McNeel*, 978 F.2d 1453, 1459 (5th Cir. 1992).

Here, the state habeas court found Blue's claim baseless. First, the affidavit of Debbie Cotie was rejected as completely incredible. 6 SHTr (2004) 520 (Findings of Fact, ¶ 80). Second, the court accepted as credible the affidavits of Blue's 1995 trial counsel, the presiding judge at the 1995 trial, as well as the courtroom bailiff for that trial. *See id.* at 521 (Findings of Fact, ¶ 81) (trial counsel's affidavit), 521 (Findings of Fact, ¶ 82) (trial judge's affidavit), 522 (Findings of Fact, ¶ 83) (bailiff's affdavit).

Blue's 1995 trial counsel responded in his affidavit:

Cotie allges that the court and prosecution were racially biased against Mr. Blue. This is [] not true. Judge John Delaney bent over backwards to make sure that race was not an issue during the trial. As stated previously, this was the third time I had tried a capital murder case against Bill Turner. I have never seen Mr. Turner make race an issue in any case, and he did not do so in the 1995 trial. Cotie also states that she heard the 272nd District Court bailiff,

> W.S. "Dub" Pearson, say "nigger is guilty." I have know Mr. Pearson for over a decade, both in his capacity as bailiff and also in his capacity as a prison minister. Since 1996, I have accompanied Mr. Pearson to the prison located in Navasota, Texas. Half of the inmates he ministers to are African-American inmates. He is very committed to his ministry and helping inmates, regardless of their race. I have never heard a slur, as to any race, come out of his mouth. It would be completely out of character for Mr. Pearson to utter a racial slur.

3 SHTr (2004) 266-70 (State's Exhibit A).

Judge John Delaney, presiding judge for the 1995 trial remembered that "the prosecution brought to my attention that Cotie broke down and had begun to cry at some point during trial. The experience of a death penalty case may have had an emotional impact on her." 4 SHTr (2004) 360-62 (State's Exhibit F). Judge Delaney also came to his bailiff's defense:

> I have no recollection of Mr. Pearson ever using such a racial slur, as alleged in the Cotie affidavit. Such a remark would not have been consistent with his character, demeanor or his attitude on race. Mr. Pearson was involved in prison ministry; he was always concerned about those who, he believed, were not getting a fair deal.

*Id*. Finally, the judge responded to the personal attacks saying, "I have no recollection of having made any racial remark; such a remark is inconsistent with my habits and beliefs, and it is highly unlikely that I would have said anything considered to be a racial slur." *Id*

W.S Pearson, the bailiff during the 1995 trial, also responded to the personal attacks:

> Since 1990, I have been actively involved in prison ministry. Once a week, I conduct a ministry at the prison in Navasota, Texas. I also conduct a weekly, non-denominational aftercare support group for parolees. In 1997, I retired from my job as bailiff in order to become the executive director for the Association of X-Offenders, Inc. This is a statewide prison ministry where parolees and probationers are received in a support group setting. We also

-82-

provide a network to help these people find jobs, places to live, clothes, food and a church home.  In all of these group settings, about half of the attendees are Black.

Deborah Cotie, the former 272nd court reporter, has alleged in an affidavit that I said "that nigger is guilty" in her presence while the two of us were speaking to Judge John Delaney in his chambers.  I have no recollection of being back in the Judge's chambers while she supposedly spoke with Judge Delaney.  However, I have no doubt that I did not say the racial slur that Cotie has accused me of saying.  To say such a thing would be completely out of character for me.  I have no bias against African-Americans or, for that matter, any race.

4 SHTr (2004) 364-65 (State's Exhibit G).

For all of the credibility choices, Blue makes absolutely no attempt to overcome the presumption of correctness they are afforded.  The state habeas court ultimately concluded that Blue's claim was "not supported by any credible evidence and is completely without merit."  6 SHTr (2004) 532 (Conclusions of Law, ¶ 125).  Because Blue has entirely failed to establish any bias, much less one that effected the trial, this rejection is not objectively unreasonable, and Blue is not entitled to federal habeas relief.  28 U.S.C. § 2254(d).

## XI.    The State Court's Conclusion that Blue was Denied Neither a Fair Trial Nor Due Process When the Trial Court Granted the State's Challenge for Cause as to Veniremember Rosa Mata was Not Objectively Unreasonable. (Claim 18).

By this claim, Blue contends that the trial court erred when it granted the State's challenge for cause as to venireperson Rosa Mata because of her beliefs about the death penalty.  Petition at 112-19.  The Court of Criminal Appeals' rejection of this claim was not objectively unreasonable as explained below.

The Supreme Court has held that a prospective juror may be excused for cause only if his views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Adams v. Texas*, 448 U.S. 38, 45 (1980); *see also Witherspoon v. Illinois*, 391 U.S. 510, 523 n.21 (1968) (". . . nothing we say today bears upon the power of the State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excused for cause were those who made it unmistakably clear . . . that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt."). The state court explained further, "A veniremember is challengeable for cause if her beliefs against capital punishment would prevent or substantially impair the performance of her duties as a juror in accordance with the court's instructions and the juror's oath." *Blue II*, 125 S.W.3d at 496 (citing *Colburn v. State*, 966 S.W.2d 511, 517 (Tex. Crim. App.  1998)).

The state court pointed out that "Mata's answers to various questions on her juror questionnaire form indicated that she had strong personal beliefs against capital punishment and that she could not impose the death penalty because of these personal beliefs." *Id*. at 497. And her answers to the questions posed by the State, defense counsel and the trial court do nothing to cast doubt on those answers.  For instance, when the prosecutor made the statement that "the State just doesn't have a shot with you in this case because of your strong feelings against the death penalty," Mata said that would be a "fair statement."  4-F RR 9.

-84-

And when she explained why her beliefs would not cause her to answer the special issues to result in a life sentence, she said:

> I think if I had to serve on the jury, as hard as it would be, I would have to put my personal feelings out of it totally. I would have to go on the evidence and the statements presented to me. My concern would be, would I be able to live with that decision, based on whatever it is, afterwards.

*Id*. Mata also said several times that she did not believe she could she could sentence someone to death. *Id*. at 10, 15, 16, 49. And in response to questioning by the trial court, she said, "It would be hard. Let's put it that way" to put her feelings aside and follow her oath. *Id*. at 50. Ultimately, Mata did deny that her feelings and beliefs would substantially impair her ability to serve. *Id*. at 51. But the trial court did not believe her: "I'm satisfied to the extent that she's answering these questions in such a way where "Sure I can follow my oath." I think she's simply saying what she thinks the Court or the attorney[s] want to hear, and I don't believe her, so the challenge will be granted." *Id*. at 62.

The Supreme Court teaches that when the partiality of a single juror is called into question, the issue "is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount*, 467 U.S. 1025, 1036 (1984) (citation omitted). This credibility determination is based in large part on the demeanor of the witness, and as the Court has explained, "[d]emeanor plays a fundamental role not only in determining juror credibility, but also in simply understanding what a . . . juror is saying . . .. Demeanor, inflection, the flow of the questions and answers can make

confused and conflicting answers comprehensible." *Id*. at 1038 n.14.  For this reason, *Patton*

afforded "special deference" to the trial court's findings on the issue of juror bias.  *Id*. at

1038.  *See also Thompson v. Keohane*, 516 U.S. 99, 109-10 (1995) (resolution of question

of juror impartiality heavily dependent on trial court assessment of witness credibility and

demeanor thus entitled to presumption of correctness); *Milton v. Procunier*, 744 F.2d 1091,

1096 (5th Cir. 1984) ("As a federal habeas court, even more remote in time, distance, and

function, the depth of deference is greater.").  The fact of Mata's credibility — or not —

must be afforded the presumption of correctness unless Blue can establish, by clear and

convincing evidence, that the presumption should not apply.  28 U.S.C. § 2254(e)(1); *see*

*Valdez*, 274 F.3d at 948 n.11; *see also Castro v. Ward*, 138 F.3d 810, 824 (10th Cir. 1998)

(trial judge's determination of juror bias entitled to presumption of correctness); *Stewart v.*

*Dugger*, 877 F.2d 851, 855 (11th Cir. 1989) (same); *Hulsey v. Sargent*, 865 F.2d 954, 959

(8th Cir. 1989) (same).  He has not.

For these reasons, Blue has not established that the state court's rejection of this claim

was objectively unreasonable.  Therefore, he is not entitled to federal habeas relief.  28

U.S.C. § 2254(d).

## CONCLUSION

For the foregoing reasons, the State respectfully requests that this Court deny Blue's

petition for federal habeas relief and grant the Director's motion for summary judgment.

Respectfully submitted,

-86-

GREG ABBOTT
Attorney General of Texas

KENT C. SULLIVAN
First Assistant Attorney General

ERIC J.R. NICHOLS
Deputy Attorney General
For Criminal Justice

GENA BUNN
Assistant Attorney General
Chief, Postconviction Litigation Division


    s/ Fredericka Sargent
*FREDERICKA SARGENT
Assistant Attorney General
Texas Bar No. 24027829
Southern District Bar No. 27909

*Counsel of Record

P.O. Box 12548, Capitol Station
Austin, Texas 78711
Tel: (512) 936-1600
Fax: (512) 320-8132

ATTORNEYS FOR
RESPONDENT

## CERTIFICATE OF SERVICE

I hereby certify that on Monday, November 19, 2007, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the following attorney of record who has consented in writing to accept this Notice as service of this document by electronic means. I also certify that I have mailed a paper copy of this pleading to counsel listed below:

John E. Wright
LAW OFFICE OF JOHN E. WRIGHT, P.C.
1202 Sam Houston Ave.
P.O. Box 6547
Huntsville, Texas 77342-6547

Don Vernay
1604 Golf Course Road SE
Rio Ranch, NM 87124
minimal243@yahoo.com

s/  Fredericka Sargent
FREDERICKA SARGENT
Assistant Attorney General
Postconviction Litigation Division
